**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

KYLE ENDICOTT, as Special )
Administrator for the Estate )
of Jennifer Crowell, deceased, )
)
    **Plaintiff**, )
)
  vs. )   No. 21-CV-319-JAR
)
TERRY PARK, in his official )
capacity as Sheriff of )
Choctaw County, )
)
    **Defendant.** )
)

**JURY TRIAL TRANSCRIPT**
**BEFORE THE HONORABLE JASON A. ROBERTSON**
**UNITED STATES MAGISTRATE JUDGE**
**FEBRUARY 4, 2026**

  Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription.

Jessyca Guerra, CSR
Federal Official Court Reporter
P.O. Box 607
Muskogee, Oklahoma 74402

UNITED STATES DISTRICT COURT -- OFFICIAL TRANSCRIPT

**EXHIBIT 1**

Q.    Okay.  And did you have any training up to that point?

A.    I was still in training.

Q.    Okay.  Do you recall what you had been trained on at that point?

A.    I don't remember, no, sir.

Q.    Okay.  Would looking at your deposition refresh your recollection?

A.    Yes.

Q.    Okay.  There should be a deposition notebook up here.

MR. BRYAN:  Your Honor, may I approach?

THE COURT:  You may.

MR. BRYAN:  Thank you.

Q.    (BY MR. BRYAN)  Now, Ms. Mooney, if you could, look at page 14, lines one through ten.  And just read that to yourself, and let me know when you're ready.

A.    Okay.

Q.    Okay.  Does that refresh your recollection?

A.    Yes.

Q.    Okay.  So, going back to the question, back on June 6, 2020, when you were working as a jailer there at the jail, what training had you had at that point?

A.    I had CPR and some jail training.

Q.    And the jail training that you had was related to what?

A.    Booking in inmates, cell checks, things of that nature.

Q.    Okay.  What about shift procedures?

**A.**    Yes.

**Q.**    Okay.  And what are shift procedures?

**A.**    Things that you will do on your shift, when you're coming on, when you're leaving.  It just depends on what the policy states.

**Q.**    Have you heard of them as post orders?

**A.**    No.

**Q.**    Okay.  But, essentially, these are job duties for specific roles that you would have at a jail.

**A.**    Yes.

**Q.**    Okay.  And you also mentioned that you had some training on book-in procedures; correct?

**A.**    Yes.

**Q.**    Okay.  Now, what type of training did you have on the book-in procedures?

**A.**    The system requires us to identify the person.  You would have to book them in by name, date of birth, taking their picture, identifying their clothing.  I'm not sure what else was on there.

**Q.**    And so, would that be essentially kind of the shift procedure for the person that was in the booking role?

**A.**    Yes.

**Q.**    Okay.  And how did the jail train you on those procedures?

**A.**    It was in the policy and procedure book, so I read it, and then it was also hands-on.  I would have to -- when a person

would come in, I would have to learn by doing it myself with someone there.

Q.    Okay.  So were shift procedures written down, or is this on-the-job training?

A.    On-the-job training.

Q.    Okay.  And the on-the-job training, did that include reviewing Post-it notes stuck on computer screens?

A.    Yes.  There was some of that.

Q.    Okay.  Now, you mentioned looking at the policy and procedure manual; correct?

A.    Yes.

Q.    Okay.  And would that include the policy that related to the condition of the inmate when they arrived at the facility?

A.    To be honest, I don't remember what the policy and procedure said.

Q.    Sure.  Why don't we take a look at -- let's see.  There should be a notebook up there of plaintiff's exhibits.  I want you to take a look at Exhibit 15.7.

          MR. BRYAN:  Your Honor, may I approach?

          THE COURT:  You may.

          THE BRYAN:  Thank you.

          THE COURT:  You may slide that deposition back so it will be out of the way.

     Good catch.

Q.    (BY MR. BRYAN)  Okay.  Ms. Hudson, I have in front of you

Plaintiff's Exhibit 15.7.  Can you identify this document?

A.    It looks like it's a page from the policy and procedure book.

Q.    Okay.

MR. BRYAN:  Your Honor, at this point in time, I would move to admit Plaintiff's Exhibit 15.7.

THE COURT:  Any objection other than those stated?

MR. MOON:  None other than those stated.

THE COURT:  All right.  That objection will be overruled.

Exhibit 15.7 shall be admitted.

Q.    (BY MR. BRYAN)  Okay.  Ms. Mooney, we're looking up here at 15.7.  This is Policy 2.03, condition of inmate; correct?

A.    Yes.

Q.    And I'm sorry.  I think I've called you Ms. Mooney, and I'm going to try to stick with Ms. Hudson.

A.    Okay.

Q.    But I apologize.

MR. BRYAN:  I want to callout this section right here, section two.

Q.    (BY MR. BRYAN)  Okay.  Did you receive any actual, like, classroom training on this particular policy?

A.    I can't remember.

Q.    Is it fair to say that you were essentially provided a policy and procedure manual --

**A.**    Yeah.

**Q.**    -- and expected to review it?

**A.**    Yes.

**Q.**    Okay.  But other than that, that was the education -- the policy-based education; correct?

**A.**    Yes.

**Q.**    Okay.  And then the hands-on training was looking at sticky notes on a computer; correct?

**A.**    The hands-on training was actually booking in someone, yes.

**Q.**    And using the sticky notes on the computer as a guide.

**A.**    Yes.  If I needed help, yes.

**Q.**    Okay.  Now, did you have any training on this particular policy, as far as looking at this policy and having somebody give you instruction about it?

**A.**    No.  Not that I can remember.

**Q.**    Okay.  Here on number two, it says, "Serious Injury:  If the injury, illness, or emotional state of the inmate appears serious, the deputy shall, first, contact his/her supervisor...."  Did I read that correctly?

**A.**    Yes.

**Q.**    Okay.  And were you trained to look at inmates who were brought to the facility to determine whether they had an injury, illness, or emotional state that was serious?

**A.**    To a degree, yes.

Q.   Okay.  Now, did you understand these policies were mandatory?

A.   Yes.

Q.   These were the rules that you had to follow as the jailers; right?

A.   Yes.

Q.   And this serious injury policy, this would apply when an inmate is first presented for booking; correct?

A.   Right.

Q.   Okay.  This is before they're actually booked in; right?

A.   Yes.

Q.   And if we go back up to the top, actually, under the policy language right here, it says, "No person shall be admitted to the facility in an unconscious state or with any evidence of serious illness or injury"; correct?

A.   Correct.

Q.   And did you receive any training on what is considered a serious illness or injury?

A.   Not that I can recall.

Q.   Do you think that would be important for somebody who is trying to apply this policy?

A.   Yes.

          MR. MOON:  Judge, may we approach?

          THE COURT:  You may.

     (Bench conference on the record)

evidence of serious illness or injury; correct?

A.   I hadn't received any training because I hadn't dealt with anyone of that nature at that point.

Q.   You worked in the booking area; right?

A.   Right.

Q.   And booking people in; correct?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   Okay.  Now, we looked at, under section 2(a), where -- or, we looked at section 2, and I want to look specifically down now at section 2(a).

So, in the situation when you have somebody who appears to have a serious injury or illness, what is the policy-based requirement here?

A.   To refuse the acceptance of custody.

Q.   Now, let's look at the other requirement under section (b).  What is the requirement under section (b)?

A.   To not accept custody until the arresting officer provides documentation of an inmate's medical treatment.

Q.   Did you receive training on that provision?

MR. MOON:  Objection.  Cumulative.

THE COURT:  Overruled.

THE WITNESS:  No.

Q.   (BY MR. BRYAN)  Do you think that would be important

accountability on who it is that's signing off on this; correct?

A.   Yes.

Q.   And it also provides you clarity; correct?

A.   Yes.

Q.   So you know that this person has been cleared for fitness for confinement by this medical provider; correct?

A.   Yes.

Q.   And that way you, as the booking officer, don't have to guess or wonder or assume about whether or not this person is fit for confinement; correct?

A.   Yes.

Q.   And those are all important things to know before you start to admit somebody who may have evidence or appearance of serious physical injury; correct?

A.   Yes.

Q.   Okay.  I want to look down now at section 3 here.  Same policy.  Have you reviewed this intoxication section prior to today?

A.   Yes.

Q.   You have?  Okay.

     If a person appears affected by drugs or alcohol, you must first determine if medical treatment is required before accepting them; correct?

A.   Yes.

A.    Judging by her behavior at that time, I wasn't sure what she was capable of.

Q.    She didn't express to you any suicidal ideation; correct?

A.    I verbally couldn't understand her, so I don't know.

Q.    The jail has a policy about suicide watch; correct?

A.    Yes.

Q.    Is that the only policy that you're aware of that relates to close supervision of an inmate?

A.    I believe so, yes.

Q.    Are you aware of a close supervision policy?

A.    No.

Q.    Okay.  I want you to look in the notebook there at Plaintiff's Exhibit 15.15.  Okay.  Can you identify that policy for the record?

A.    "Surveillance of Holding Cell."

Q.    Was this a policy at the Choctaw County Jail?

A.    Yes.

        MR. BRYAN:  Your Honor, at this time, I'd move to admit Plaintiff's Exhibit 15.15.

        MR. MOON:  No objection other than those previously stated.

        THE COURT:  All right.  Those previously stated objections will be overruled.

    Exhibit 15.15 shall be admitted.

Q.    (BY MR. BRYAN)  Ms. Hudson, looking at this policy, do you

recall receiving training on this one?

A.    Yes.

Q.    Okay.  I want to direct your attention down to section 3(d).

       This says, "Separation and Increased Frequency"; correct?

A.    Yes.

Q.    And this is for supervising inmates who have been brought into the facility and placed in the holding cells; correct?

A.    Yes.

Q.    And this says, "If a receiving deputy suspects that an inmate may be suicidal, assaultive, or in need of medical observation, the receiving deputy shall," a, b, c, and "d. Observe the holding cell every 15 minutes or more frequently as necessary"; correct?

A.    Yes.

Q.    Okay.  Does this policy provide for increased supervision of at-risk inmates?

A.    Yes.

Q.    Does this policy require the removal of clothing?

A.    This policy doesn't state it, no.

Q.    So somebody who is not expressing suicidal ideation but yet requires close supervision could be subject to this policy; correct?

A.    Yes.

Q.    And being subject to this policy would not require that

A.    Yes.   This was during COVID time.

Q.    And that was left on her when she was left in the cell; correct?

A.    Yes.   I believe whoever was at her head during the cell portion of it -- they forgot to remove the mask.

Q.    Ms. Hudson, I'm going to show you -- or, if you can, look in this notebook here at Policy 15.27.  I'm sorry.  It's Exhibit 15.27, not policy.

A.    You said two seven?

Q.    Yes, ma'am.  Policy 15.27 -- or, Exhibit 15.27.

A.    I'm not seeing 15.27.

Q.    Okay.

        MR. BRYAN:  Your Honor, may I approach?

        THE COURT:  You may.

        MR. BRYAN:  I apologize.

        THE WITNESS:  Okay.  Thank you.

Q.    (BY MR. BRYAN)  Okay.  Ms. Hudson, do you have Exhibit 15.27 in front of you?

A.    Yes.

Q.    And can you identify this for the record?

A.    It's medical service policy.

Q.    Okay.  This was a policy at the Choctaw County Jail.

A.    Yes.

        MR. BRYAN:  Your Honor, I would move to admit Policy [sic] 15.27.

MR. MOON:  Just those previously stated, Your Honor.

THE COURT:  All right.  The previously stated objections are hereby overruled.

Therefore, Plaintiff's Exhibit 15.27 -- it appears to have three pages, 15.27-1, -2, and -3 -- shall be admitted.

Q.   (BY MR. BRYAN)  Ms. Hudson, as part of your training, did you receive any instruction on this Policy 6.01?

A.   I can't remember.

Q.   Have you seen this document before?

A.   Yes.

Q.   Okay.  Section 1 here, it says, under "procedures," it says, "staff."  It states there is a director of medical services at the detention center.

A.   Yes.

Q.   During your time as an employee at the Choctaw County Jail, was there ever a director of medical services?

A.   I can't recall, no.

Q.   Was there ever a licensed doctor that would come to the facility?

A.   I don't believe I ever met one.

Q.   When Jennifer was in cell four, you did observe her body convulsing; correct?

MR. MOON:  Objection, Judge.  Cumulative.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I don't know that it was convulsing.

Q.   (BY MR. BRYAN)  Did you observe her body moving in ways that you considered unnatural?

A.   Yes.

Q.   Did you see anybody call a director of medical services?

A.   I didn't personally witness anyone, no.

Q.   Did you call a director of medical services?

A.   No.

Q.   In fact, for the first several minutes there in cell four, was any medical care being provided at all?

A.   Honestly, I don't remember.

Q.   You don't have any recollection of seeing any medical care being administered, do you?

A.   Not within the first few minutes, no.

Q.   Let's look at Joint Exhibit 33.9.

THE COURT:  And, Mr. Bryan, before we pull up that exhibit, is this a good point, depending upon how much time you have left?  It is now noon.

MR. BRYAN:  Yeah, Your Honor.  This is probably -- I was going to get into some body camera footage, so, yeah.

THE COURT:  Okay.  So, yeah, if we're going to have several of those to go through, this seems like a good, natural break, then, for us to take our noon recess.

I will remind you all of the same admonition I always give:  You are not to discuss this case with anyone or each

MR. MOON:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. MOON:

Q.   Good afternoon, Ms. Hudson.

A.   Good afternoon.

Q.   I want to talk about June 26, 2020, and at that time, you said you were still in training; is that correct?

A.   Yes.

Q.   And as part of your training you read the policies and procedures, and then someone would show you how to do something, and then you would do it.  That was how you were trained; correct?

A.   Yes.

Q.   And you said you received training on the booking process as well.

A.   Yes.

Q.   And I believe the first part of the booking process, or the first step, is to identify the person you have.

A.   Yes.

Q.   Do you recall Officer White and Christie Terry-Ball being unsure of whether they had Jennifer or her sister?

A.   Yes.

Q.   Tell me about that.

A.   There was confusion.  I didn't know her personally, so I didn't know who she was, and I believe Christie stated that she

wasn't sure whether she was Ms. Jennifer or possibly her sister.

Q.   And that's the first step in booking somebody is who do you have; right?

MR. MOON:  Shawna, I would like to pull up Plaintiff's Exhibit 15.7.  And I want to zoom in on part 2(b). There we go.

Q.   (BY MR. MOON)  I believe you testified that this was one of the booking procedures that you trained on; correct?

A.   Right.

Q.   And it states in part 2(b), "Not accept custody until the arresting officer provides documentation of the inmate's medical treatment."

A.   Yes.

Q.   Do you recall Christie Terry-Ball asking for documentation of Ms. Crowell's medical treatment?

A.   Yes.

Q.   Was your training on this policy in any way a deciding factor in you deciding how or whether or not Ms. Crowell would come into the jail?

A.   I'm sorry.  Say that again.

Q.   Sorry.  It was a little wordy, and it kind of walked around a little bit.

A.   Yeah.

Q.   I apologize.

Was it your call whether or not the jail would accept Ms. Crowell?

A.    No, sir, it was not my call.

Q.    And you saw Christie Terry-Ball putting this policy into action; correct?

A.    Yes.

Q.    When she asked the officers for documentation of Ms. Crowell's medical treatment, what did they say?

A.    I don't exactly remember all of the words.  I don't know if they had it at that time or not.

Q.    Do you recall giving a deposition in this case?

A.    Yes.

Q.    Was your memory at the time -- was that closer to the event, when you gave your deposition?

A.    Yes.

Q.    Do you think reviewing your deposition testimony on that subject would refresh your memory?

A.    Yes.

Q.    I would like you to turn to page 28 of your deposition. And I'd like you to focus on lines three through 19, and just read it to yourself.

A.    Okay.

Q.    Does that refresh your memory?

A.    Yes.

Q.    Isn't it true that when Christie Terry-Ball asked for a

medical clearance, the officers told her that it was on its way and either in the vehicle or another officer was bringing it?

A.    Yes.

Q.    And so, did they represent that they were going to provide documentation of Ms. Crowell's medical clearance?

A.    Yes.

Q.    Did they ever provide that documentation, to your knowledge?

A.    I didn't receive it, so I'm not certain.

Q.    Did the officers, during the time you were in the jail entryway, ever say anything to you about Ms. Crowell having a seizure previously?

A.    Not to me.  I believe that was a discussion between the officers and Ms. Christie.

Q.    Which officer would have said that?

A.    Possibly Dustin Gibbs or Bob White.

Q.    Okay.  Do you know when Officer White had come on duty?

A.    No.  I don't remember.

Q.    Okay.  Do you know whether Officer Gibbs had had any prior contact with Ms. Crowell that day?

A.    I -- I don't know.

Q.    Are you not sure about that?

A.    Uh, yeah.

Q.    You testified previously that, in regards to whether or not you thought Ms. Crowell was suicidal, you, quote, didn't

**Q.** Okay. Do you recall Don Loman being there?

**A.** He may have been the one that was standing there, yes.

**Q.** Okay. And at any point in time, was Ms. Crowell left by herself, observed at the Choctaw County Jail?

**A.** No. Not to my knowledge.

**Q.** Basically, the entire time she was at the jail, all of those people were present, watching Ms. Crowell; correct?

**A.** Yes. In one way or another, one to all of us had our eyes on her at all times.

**Q.** Have you ever worked in the medical field?

**A.** Yes.

**Q.** Can you explain that to me?

**A.** I was a certified nurse's aide and a certified medication aide for several years.

**Q.** And that was prior to June 26, 2020.

**A.** Yes.

**Q.** And what did you have to do to get the certification?

**A.** I went to classes, received the training at the classes, and took a test -- a state test.

**Q.** And had you worked previously with Deputy Gibbs in the medical field?

**A.** Yes.

**Q.** Okay. And were you aware of his medical training?

**A.** Some of it. We were volunteer fire fighters together.

**Q.** And what about Don Loman? Did you have any knowledge

about his medical training?

**A.**    No, sir.  This is the first time I worked with him.

**Q.**    Okay.  Fair to say that you and Deputy Gibbs had fairly significant medical training.

**A.**    Yes.

**Q.**    And you were in Ms. Crowell's presence the entire time she was in the jail.

**A.**    Yes.

**Q.**    Had you worked as a jailer previously?

**A.**    I had prior knowledge of some jailing.  I did not work in a large jail.

**Q.**    Where was that at?

**A.**    Broken Bow PD.

        MR. MOON:  Shawna, I'd like to pull up Joint Exhibit Number 33.3 now, and let's go to 0:14:50.

    And stop it right there.

**Q.**    (BY MR. MOON)  Ms. Hudson, can you see the timestamp in the top left-hand corner?

**A.**    Yes.

**Q.**    And what time does that say?

**A.**    14:30.

**Q.**    Is that 2:30 p.m.?

**A.**    Yes.

**Q.**    And it looks like 14:30:54; correct?

**A.**    Yes.

A.    Before she hit her head, yes.

Q.    At any point when she's in the foyer of the jail, did you see her turning blue?

A.    No.

Q.    At any point when she's in the entryway of the jail, did you see her involuntarily moving?

A.    No.

Q.    Was there anything you observed in the entryway of the jail that led you to believe Ms. Crowell was going to have a medical episode once she was placed in cell four?

A.    I -- I don't know what she was going to have.

Q.    How many times did Christie Terry-Ball ask the Hugo PD officers for a medical clearance?

A.    I'm not sure.

Q.    Was it more than once?

A.    I think it's safe to say yes.

Q.    And did they ever provide one?

A.    I didn't personally take it, so I don't know.  I believe at some point there was an exchange of documentation.

Q.    Did you ever see that?

A.    No.

Q.    Thank you, Ms. Hudson.

        THE COURT:  Thank you, Mr. Moon.

    Mr. Bryan, would you like to redirect?

        MR. BRYAN:  Yes, Your Honor.

Q.    Even though there's a policy that says the jail has a medical director; right?

MR. MOON:  Objection.  Cumulative.

THE COURT:  Overruled.

THE WITNESS:  Correct.

Q.    (BY MR. BRYAN)  So, when you have to go to policy to find out what to do, and it says, "Hey, you need to talk to the medical director," there was nobody there to ask; right?

A.    Not in person.

Q.    There's nobody to call either.

A.    I don't believe so.

Q.    That's another reason to have a medical clearance, isn't it?

A.    Yes.

Q.    And you were asked questions about being back in cell four and Jennifer -- or you believing that she may be hostile or combative back in cell four; right?

A.    Yes.

Q.    Okay.  I want to be clear.  The reason that anybody is in cell four to begin with is because Sheriff Park has decided to place her on suicide watch; correct?

A.    Yes.

Q.    Because, otherwise, you wouldn't be in there, trying to take her clothes off; right?

A.    Correct.

lines ten through 14.

"QUESTION:  Was it consistent with the practice, the book-in practice, to admit people who were potentially psychotic?

"ANSWER:  Yeah, we would admit them."

Did I read that correctly?

A.  Yes, sir.

Q.  Is that a true statement?

A.  Yes.

Q.  Could you appreciate that placing a person in jail who is in acute psychosis can increase their risk of harm, particularly inside a jail?

A.  Yes.

Q.  Was there any medical staff at the jail?

A.  No, sir.

Q.  No nurses, no LPNs, and no doctors; correct?

A.  No, sir.

Q.  So the practice was, if there was a type of question that involved a medical issue, your responsibility was to contact the jail administrator; is that correct?

A.  Yes.

Q.  And that was Christie Terry-Ball; correct?

A.  Yes, sir.

Q.  Had you encountered Jennifer Crowell before June 26, 2020?

A.  I had.

was instructing; correct?

A.   I knew that Hugo PD wasn't going to take her.  And Terry was left with the only decision he could make at the time is put her in a cell, and let's watch her.

Q.   Isn't another decision that he could call the hospital?

A.   I suppose he could have.

Q.   And he couldn't call a medical director because that position was not staffed; correct?

A.   No.

Q.   Couldn't call the jail nurse because there was none; correct?

A.   No.

Q.   So the jail actually uses the hospital for its medical care, does it not?

A.   It does.

Q.   So there's a relationship there; right?

A.   Correct.

Q.   And so, even though there's a relationship there, and there's some confusion about whether the hospital would accept her, nobody thought to call the hospital.

A.   I suppose not.

Q.   Who was it that decided to put Jennifer in a cell?

A.   That was the sheriff.

Q.   And her clothing was removed; correct?

A.   Yes, sir.

THE COURT:  You may.

(Retrieves documentation from witness)

Q.   (BY MR. MOON)  On April 11, 2019, did you receive training from Stewart Standfield from the Choctaw County Jail in the handling of mentally ill individuals?

A.   Yes.  I do remember Stewart teaching a class.

Q.   And that was in April of 2019; correct?

A.   I'm not sure about the date, but I do remember Stewart teaching us one.

Q.   And in April of 2019, did you receive training on first aid and CPR?

A.   Yes.

Q.   And did you receive training on the Oklahoma Jail Standards?

A.   Yes.

Q.   Did you receive training on medication as well?

A.   Yes.

Q.   Who's Charity Rosenthal?

A.   A lady that came and talked.  One of the classes.

Q.   Do you know where she came from?

A.   I do not.

Q.   Was she a medical professional?

A.   I have no idea.

Q.   Was that who taught you CPR and first aid, though?

A.   Yes.  Well, I'm assuming she would have been if she came

**Q.** And what does the timestamp say?

**A.** It looks like 14:30.

MR. MOON: And, Shawna, go back to the beginning of this video. I'm sorry. Go to the part where she's brought in. Right there. Stop it.

**Q.** (BY MR. MOON) Do you see the timestamp of 14:17:17 on the video as Jennifer is brought in?

**A.** Yes, sir.

MR. MOON: Shawna, let's go to Joint Exhibit 1, page four, and callout the bottom, "Disposition/Discharge."

**Q.** (BY MR. MOON) Ms. Melton, I'm going to show you what is a record from Choctaw Memorial that says on 6/26/2020 at 14:11, Ms. Crowell departed from the Choctaw Memorial Hospital emergency room.

How long does it normally take to get from the Choctaw Memorial Hospital emergency to the jail?

MR. BRYAN: Foundation.

THE COURT: Overruled.

THE WITNESS: It's less than a mile. It shouldn't take a couple of minutes.

**Q.** (BY MR. MOON) Five minutes?

**A.** Not even that long.

**Q.** Does it take somebody time to load somebody into the car and unload somebody from the car?

**A.** Oh, yes, sir.

**Q.**   If Jennifer left the Choctaw Memorial Hospital emergency room at 14:11 and arrived at the Choctaw County Jail, according to the surveillance audio, at 14:17, would that tell you that the time on the surveillance video is correct?

**A.**   Yes.

**Q.**   And so, if the time on the surveillance video shows that the sheriff arrived at 14:30, would you say that's correct?

**A.**   Yes, sir.

        MR. MOON:   Shawna, I would like to pull up Joint Exhibit 12 now.

**Q.**   (BY MR. MOON)  Do you see Joint Exhibit 12, Ms. Melton?

**A.**   Yes, sir.

**Q.**   And do you recognize this document?

**A.**   It's a dispatcher log.

**Q.**   For June 26, 2020, at 2:40 p.m., or 14:40 --

**A.**   Yes.

**Q.**   -- that says, "R/p requested EMS for inmate that was just arrested."

        Does that show that EMS was contacted at 14:40, some nine minutes and six seconds after the sheriff arrived at the jail?

**A.**   Yes, that's what it says.

**Q.**   You testified previously that Ms. Christie Terry-Ball asked Jennifer multiple times, "What have you taken?"; correct?

**A.**   Yes.

**Q.**   And that she made mention to the Hugo police officers,

including Don Loman, that she thought Ms. Crowell might have taken some bad drugs; correct?

A.    Yes.

Q.    Did these officers from the Hugo Police Department ever tell you or ever tell Ms. Christie Ball -- Ms. Terry-Ball -- in your presence that Jennifer had been given the max dose of Haldol?

A.    No.  We did not know that.

Q.    Did they ever say that she had been given three doses of Ativan?

A.    No.

Q.    Did they ever say that she had had a seizure prior to her arrival at the jail?

A.    No.  We did not know that.

Q.    Did they ever tell you that she had not received any treatment at the hospital?

A.    No.  We didn't know neither.

Q.    Did they ever tell that none of the orders the doctor had ordered had been completed?

A.    No.  We did not know that.

Q.    Did they ever say any of that to the sheriff in your presence?

A.    Not that I am aware of.

Q.    Do you think that would be important information for him to know in deciding what to do with Jennifer?

A.    Absolutely.

Q.    And so, if an officer had that knowledge and didn't volunteer it, that would be a problem; right?

A.    Yes, it would.

Q.    In fact, you guys sat in that entryway for quite a while discussing the bad drugs she had taken.

A.    Yes.

Q.    And yet nobody from Hugo said, "Well, hey, 25 minutes ago at the hospital, she was walking around, talking, asking for lunch, and then they gave her two shots at once, and all of a sudden, she can't walk."  Nobody ever said that, did they?

A.    No, they didn't.

Q.    Would that have made a difference?

A.    Yes, it would.

      And just the difference of knowing that they picked her off the sides of the road, having a seizure, no one ever said that.  That's why she went to the hospital in the very first, but nobody said that.

Q.    How many times did Sheriff Park ask the Hugo officers, "Can't you just take her back to the hospital?"

A.    Multiple times.

Q.    And what did they say each time?

A.    That the hospital said not to bring her back.

Q.    And you testified previously that Sheriff Park said, "Put her in there until we can figure out what to do."

It was clear that Hugo wasn't going to take her to the hospital; is that correct?

A.    No, they just stood there doing absolutely nothing.

And I don't believe Terry -- he really didn't know what to do because he -- it was Hugo PD's arrest, not Choctaw County's. And they just dumped her on us. And like Terry said, "I can't just turn her out, and I can't just leave her laying in the floor. Put her in the cell, and let's watch her, and let's figure out what we're going to do."

Q.    Do you think the sheriff wanted to have Jennifer Crowell in the jail?

A.    No, he did not, but he didn't have an option.

Q.    I heard, on the body camera, someone, after the cell is closed and after the -- after Ms. Crowell's clothing has been removed, say, "What do y'all think she's on?" Did you hear that?

A.    Yes. I think it was a PD officer.

Q.    And I heard Deputy Gibbs say "flakka."

A.    Yes, sir.

And I said fentanyl at first.

Q.    And I heard somebody say, "I've seen this type of reaction on flakka."

A.    Yes, sir.

Q.    Have you had experience with people on drugs having involuntary movements?

A.    Well, of course.

Q.    Tell me about that.

A.    They just -- they just -- what I know as tweaking.  They just make moves that they don't even know they're doing.  It could be facial moves, their tongue flicking in and out, their arms moving, their legs moving.  Then, just -- they can't sit still in a chair.  I've seen all kinds of stuff.

Q.    Do you know how many seconds elapsed between you noticing that Ms. Crowell's hand was limp and EMS being contacted?

A.    No.  I don't know how long, but...

Q.    Was it shortly thereafter?

A.    Yeah, it was shortly thereafter.

It was when we opened the cell back up that very last time and went back in.  And I noticed, when he said, "Take her bracelet off," and I could see her hand was -- just her hand part.  And I really didn't know what that was from.  It could have been when she was laying on it or whatever, but I just made mention that her hand was turning colors.

Q.    That was different from how she was in the entryway.

A.    Yes.

Q.    You never saw her in the entryway go limp, did you?

A.    No.  She always had movement.

Now, I mean, at one point, she would have got to her feet had they not sat her back down.

Q.    Did you ever, in the entryway, see any part of her body

turning blue?

A.    No.

Q.    Do you know if the reason Ms. Crowell couldn't communicate at the jail was because she had been given the maximum dose of a sedative at the hospital?

MR. BRYAN:  Speculation.  602.

THE COURT:  Overruled.

You can answer if you know.

THE WITNESS:  Could you repeat that again?

Q.    (BY MR. MOON)  I can.  Do you know if the reason that Ms. Crowell couldn't communicate at the jail was because she had been given the maximum dose of two sedatives at the hospital?

MR. BRYAN:  602.

THE WITNESS:  No, we were not aware of anything the hospital did.  We wasn't aware of any seizures.

All we could assume, when they brought her in, is that she had taken some drugs, and she had probably gotten ahold of some bad drugs because she was way worse than she normally had ever been.

But if Hugo PD had have told us, "Hey, we picked her up on the side of the road the first thing this morning, having seizures," well, that would have been a whole different story.

If they would have told us that she was at the hospital, she was fighting the nurses, she -- she wanted a tray, she was