# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

KYLE ENDICOTT, as Special Administrator for the Estate of Jennifer Crowell, deceased, )

                 **Plaintiff**, )

    vs. )           **No. 21-CV-319-JAR**

TERRY PARK, in his official capacity as Sheriff of Choctaw County, )

              **Defendant**. )

---

**JURY TRIAL TRANSCRIPT**
**BEFORE THE HONORABLE JASON A. ROBERTSON**
**UNITED STATES MAGISTRATE JUDGE**
**FEBRUARY 5, 2026**

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription.

---

Jessyca Guerra, CSR
Federal Official Court Reporter
P.O. Box 607
Muskogee, Oklahoma 74402

UNITED STATES DISTRICT COURT -- OFFICIAL TRANSCRIPT

**EXHIBIT 2**

MR. MOON:  Judge, this is also relevant because Mr. Terrill's entire presentation was to present her as a normal functioning person.

THE COURT:  I definitely believe that there's testimony elicited as to his understanding and what he observed as her mental health.  So that is something I will take into consideration as I'm considering it.

But if you-all will take your seats, we're going to take our mid-morning break.

MR. MOON:  Thank you, Judge.

THE COURT:  Ladies and gentlemen, we're going to take our mid-morning break just a little bit earlier today.

So, at this time, I'm going to read to you my standard instruction that I've read the entire time, which you'd think I would have memorized, but I have not:  You are not to discuss this case with anyone or each other.  You must not investigate any aspect of the case on your own, and you're not to reach any conclusions until the case has been presented to you.

If all persons in the courtroom will remain seated.

Jurors, you may now exit.  We'll be about 15, 20 minutes.

All right.  The record will reflect the jurors have left the courtroom.

Mr. Johnson, if you will, excuse yourself.  I'll just excuse you to the hall, and we'll be back in about 15 minutes. We'll call you when we're ready, sir.

THE COURT:  So, if you will, just simply answer the question he asks.  And if he wants to get further information, or Mr. Terrill wants further for you, he can come back and ask you those questions.

THE WITNESS:  All right.  Yes, sir.

THE COURT:  And I'm just going to ask you to listen specifically to what he asks and to answer that question.

You can ask another question, Mr. Moon.

Q.   (BY MR. MOON)  That's what you testified to at your deposition -- that your belief was, when she had a seizure in 2018, she was coming off drugs --

A.   Okay.

Q.   -- correct?

A.   Sure.

Q.   Now, in response to plaintiff's questions, I believe you stated that it was your belief that Ms. Crowell had been beat to death.

A.   Yes, sir.

Q.   Isn't it true that you testified previously at your deposition you believed it was Hugo Police Department that beat her to death in retaliation for assaulting Nurse Bullard?

A.   I have no clue who it was.  If that's what I said, yes. Okay.  Sure.

MR. MOON:  I'd ask to approach, Your Honor.

THE COURT:  You may.

MR. MOON:  Page 94.

Q.   (BY MR. MOON)  Do you see page 94 of your deposition, lines six through 24?

A.   Yes.

Q.   Can you read those to yourself?

A.   Okay.

Q.   Isn't it true, at your deposition, sir, you testified that it was your belief the Hugo Police Department beat Jennifer Crowell to death in retaliation for assaulting Nurse Bullard?

A.   Yes.

Q.   Did you tell Aaron that?

A.   No.

Q.   On June 26, 2020, did you go to a fish fry at B.J. and Ruth Ann's?

A.   I don't know.

MR. MOON:  Thank you.

THE COURT:  Any redirect?

MR. TERRILL:  No, Your Honor.

Mr. McKay, thank you very much for being here today.  You may be excused, sir.

THE WITNESS:  Thank you, sir.

THE COURT:  Mr. Terrill, Mr. Bryan, would you like to call your next witness?

MR. BRYAN:  Thank you, Your Honor.

Q.   Were you responsible for the day-to-day operations there at the jail?

A.   Yes.

Q.   And who was in your chain of command?

A.   Terry was the one above me.

Q.   And when you say Terry Park, you're referencing Sheriff Terry Park?

A.   Yes.

Q.   If you can, just briefly describe for me the scope of the job duties that the jail administrator was tasked with there at the Choctaw County Jail.

A.   Well, scheduling, scheduling appointments for the inmates, taking them to court, taking them to doctor's appointment.

Q.   Were you also responsible for following policy?

A.   Yes.

Q.   And making sure staff followed policy?

A.   Yes.

Q.   Were you familiar with the Policy 2.03, the condition of inmate policy there at the jail?

A.   I don't remember.

Q.   Okay.  Do you recall a policy that required a medical clearance?

A.   Yes.

Q.   Tell me a little about what you recall about that policy.

A.   Just that if they were -- needed medical attention before

they come into the jail, they had to have clearance from the hospital.

Q.    What was your understanding about why that policy existed?

A.    For protection for the inmates.

Q.    And how would that policy protect an inmate?

A.    If they were sick or something, they would get medical care before they come to jail.

Q.    Can placing a sick inmate inside a jail increase the risk to that person?

        MR. MOON:  Objection.  Leading.

        THE COURT:  Overruled.

        THE WITNESS:  Yes.

Q.    (BY MR. BRYAN)  How so?

A.    Because we're not a medical facility.

Q.    There at the jail, at least this particular jail, you didn't have any medical staff on site; correct?

A.    Correct.

Q.    So, no doctors; right?

A.    Right.

Q.    No LPN, no nurses, anything like that?

A.    Correct.

Q.    So, if somebody gets sick at the Choctaw County Jail, there's not a medical staff, there's not a medical person there to see them; correct?

A.    Correct.

A.    Yes.

Q.    So that was when this incident was still fresh in your mind.  Would you agree with that?

A.    Right.

Q.    Okay.  I want to direct you, first, to the second sentence at the end of the first line.  It starts with "Jennifer," where it says, "Jennifer was on the floor face down, laying on her stomach.  Jennifer was making noise, but nothing was understandable."

      Did I read that correctly?

A.    Yes.

Q.    Was this an indication to you, also, that Jennifer was not in any condition to be booked into the jail or brought into the jail?

A.    Correct.

Q.    It goes on, the next sentence, it says -- or, down.  I want to move down -- I apologize -- where it says, "I asked had she been medically treated and he advised she had not because she assaulted the nurse...."

      Did you see that?

A.    I don't see that on this.  Oh, yes, I do.  Yes.

Q.    Okay.  Maybe that's a little better.

      Who did you ask that question to, if you recall?

A.    It was either Officer Bob White or Don Loman.

Q.    And why did you ask that question?

THE COURT:  Overruled.

THE WITNESS:  I felt like she needed medical attention, yes.

Q.   (BY MR. BRYAN)  Okay.  Did you have a policy that addressed what to do with people that had evidence of serious illness or injury?

A.   Yes.

MR. BRYAN:  I'm going to look now at Exhibit 15.7.

MR. MOON:  Plaintiff's or joint?

MR. BRYAN:  Plaintiff's.

THE COURT:  I'm sorry.  Which exhibit was it?

MR. BRYAN:  15.7, Your Honor.

THE COURT:  Thank you.

Q.   (BY MR. BRYAN)  Okay.  Ms. Terry-Ball, can you see what's here on the screen?

A.   Yes, sir.

Q.   And can you identify this document?

A.   It's the condition of an inmate policy.

Q.   Okay.  This is one of the policies at the jail; correct?

A.   Yes, sir.

Q.   Now, I want to look, very first, at the top of the page where it says "policy."  What is the purpose of that policy?

A.   "No person shall be admitted to the facility in an unconscious state or with any evidence of serious illness or injury."

**Q.** And you would agree that this policy would apply to Ms. Crowell.

**A.** Correct.

**Q.** And let's look down at "procedure." Let's look under section 2(a) and (b).

Now, under 2(a), it says, "If the injury, illness, or emotional state of the inmate appears serious, the deputy shall first contact his/her supervision, and second, refuse acceptance of custody and recommend that the arresting officer seek medical attention for the inmate."

Did you read that correctly?

**A.** Correct.

**Q.** Would you agree that this policy would also apply to Jennifer Crowell?

**A.** Yes, sir.

**Q.** Let's look at 2(b). It continues on, and says, "not accept custody until the arresting officer provides documentation of the inmate's medical treatment."

Does this policy apply to Ms. Crowell?

**A.** Correct.

**Q.** Would you agree that following this policy is mandatory?

**A.** Yes.

**Q.** And you agree that you are required to follow this policy as the jail administrator; correct?

**A.** Correct.

**Q.**   And you agree that you did ask the officers for medical clearance; correct?

**A.**   Correct.

**Q.**   Agree that you requested the medical clearance because Jennifer Crowell fit the criteria for the policy?

**A.**   Correct.

**Q.**   And agreed that they told you that there was no medical clearance; right?

**A.**   Right.

**Q.**   And that would trigger this Policy, 2(b); correct?

**A.**   Correct.

**Q.**   What was your expectation if the officers had left with Jennifer Crowell to get a medical clearance?

**A.**   I don't understand the question.

**Q.**   Sure.  And I guess let's back up for a second.

We looked at your report that indicated that there was no medical treatment for Ms. Crowell and no medical clearance; correct.

**A.**   Correct.

**Q.**   Okay.  And you told the officers that they needed to get a medical clearance; correct.

**A.**   Correct.

**Q.**   But they didn't immediately take Jennifer and leave the facility; correct?

**A.**   Correct.

MR. MOON:  Objection.  Cumulative.

THE COURT:  Overruled.

Q.   (BY MR. BRYAN)  I'm going to go back to your report, Joint Exhibit 18.  Okay.  I've highlighted this one line here.  It says, "Bob White had called someone and advised us to book her in."  Do you see that?

A.   Yes, sir.

Q.   Now, was this in response to you telling them they needed the medical clearance?

A.   Yes.

Q.   Okay.  And then, if you go down to the next line, it says, "I asked Officer White who said to book her in.  He said Walter."

Do you recall who Walter was?

A.   Yes.

Q.   Who was Walter?

A.   Walter Bullard.  He was the supervisor for Bob White.

Q.   And was he in your chain of command?

A.   No.

Q.   So did that carry any weight with you?

A.   No.

Q.   And is that why you decided to call Terry Park?

A.   Yes.

Q.   And what happened when he got there?

A.   He came in and looked at her and talked to them, the

officers, and they decided to put her in a cell to watch her.

Q. Did you tell Sheriff Park before he made that decision that Jennifer Crowell was presenting differently than she had previously.

A. I told him that she was way out there.

Q. And --

A. I did tell him that she was different -- acting differently.

Q. Okay. So you knew that she was acting differently. You communicated that to the sheriff as well; correct?

A. Yes.

Q. Okay. And you also communicated to the sheriff that Jennifer needed to be checked out at the hospital; correct?

A. Correct.

Q. And you believed that she needed to be checked out at the hospital; correct?

A. Correct.

Q. This wasn't just a formality; correct?

A. Correct.

Q. And you appreciated that accepting somebody into the facility who had a serious injury or illness could potentially cause harm to that person; correct?

A. Correct.

MR. MOON: Objection. Asked and answered. Cumulative.

BY MR. MOON

Q.    Good afternoon, Ms. Terry-Ball.

A.    Good afternoon.

Q.    In addition to being the jail administration at the Choctaw County Jail, you were also the training coordinator; correct?

A.    Correct.

Q.    And at the Choctaw County Jail, all of the detention officers receive training on the policies and procedures; correct?

A.    Correct.

Q.    And they also receive training on the jail standards, the Oklahoma jail standards; correct?

A.    Correct.

Q.    Did detention officers receive first aid and CPR training?

A.    They did.

Q.    And was there a nurse who came from Howard McLeod to teach the first aid and CPR classes?

A.    From Howard McLeod.

Q.    Howard McLeod.

      Ms. Terry-Ball, do you have knowledge about what the first aid course contained information about?

A.    It was just basic first aid.

Q.    Did it include training about heart problems?

A.    It touched a little bit on it.

UNITED STATES DISTRICT COURT -- OFFICIAL TRANSCRIPT

**Q.** Did it have information about seizures?

**A.** Touched a little bit on it.

**Q.** And was it useful to the jailers -- strike that.

Was it the expectation of the jail that the first aid course would be used to help them determine whether or not an arrestee potentially had a serious medical condition at booking?

**A.** Yes.

**Q.** And every single detention officer received a first aid class and were certified in CPR; correct?

**A.** Correct.

**Q.** If a detention officer had any question whatsoever as to the medical fitness of an arrestee, what were they supposed to do?

**A.** Call me or call Terry.

**Q.** And if you had any question regarding the medical fitness of an arrestee, what would you do?

**A.** Send them to the hospital or to the doctor's office.

**Q.** You talked about the typical presentation when plaintiff questioned you about Ms. Crowell, but I don't think I ever heard you describe what was Ms. Crowell's typical presentation at the jail.

**A.** She would come in, and she would be erratic.  I mean, she would holler and bang and...

**Q.** Did she normally come in under the influence?

A.    Correct.

Q.    Under the influence of what?

A.    Some type of drug.

Q.    Did you ever see her come to the jail when she was not under the fluence of drugs?

A.    No.

Q.    What was Ms. Crowell like once she had sobered up and was no longer under the influence of drugs?

A.    She was a typical inmate then.

Q.    How many times do you think you had contact with Ms. Crowell as an arrestee or inmate?

A.    Numerous.

Q.    At the jail, did you keep a CPR and first aid book?

A.    I did.

Q.    Where did you keep it?

A.    It the jailers book-in office.

Q.    Did jailers know that that book was there?

A.    Yes.

Q.    And why did you keep that book there?

A.    Just for reference.

Q.    I want to ask you about when the Hugo officers came to the jail with Ms. Crowell.  First off, do you have the authority to refuse somebody from admittance from the jail?

A.    I did.

Q.    When you were jail administrator?

A.    Yes, sir.

Q.    And you didn't need to check the sheriff to refuse somebody from the jail, did you?

A.    No.

Q.    Did you tell those Hugo officer you were not accepting Ms. Crowell?

A.    I did.

Q.    How many times did you tell them?

A.    Numerous.

Q.    What did they do in response to you telling them that?

A.    Nothing.

Q.    Did they leave to get her a medical clearance?

A.    No.

Q.    Did you tell them you needed a medical clearance?

A.    I did.

Q.    How many times had you told them when they said, "Well, we'll just call our supervisor, Walter"?

A.    I still told them after.  Walter wasn't anything to me.

Q.    I know, but that was their initial response was to call their supervisor, Walter; Correct?

A.    Correct.

Q.    And what was your understanding of what Walter had told them?

A.    They said Walter told them to book her in.

Q.    And you still told them she wasn't coming into the jail,

she needed a medical clearance; correct?

A.    Correct.

Q.    Do you feel like they were trying to take Ms. Crowell?

A.    Somewhat.

Q.    What did they tell you about the medical treatment Ms. Crowell received at the hospital?

A.    Absolutely nothing.

Q.    Did you have a belief that Ms. Crowell was on some type of drug that she didn't normal take when she presented to the jail initially on June 26, 2020?

A.    Correct.

Q.    Did you think she had gotten some bad drugs?

A.    Correct.

Q.    And the Hugo officers, they never told you, "Hey, she's been given the maximum dose of Haldol at the hospital.

A.    No, they did not.

Q.    They didn't tell you she had been given three doses of Ativan at the hospital.

A.    No, they did not.

Q.    They didn't tell you that, "Hey, 20 minutes ago, she was walking around, talking, and asking for lunch."

A.    No, they did not.

Q.    You would agree with me it makes a difference how serious a medical condition is if it's a new or sudden onset of new symptoms.

**Q.** Did that result in their treatment being terminated?

**A.** No.

**Q.** And so, when the officers, all three Hugo officers, told you that she could not be returned to the Choctaw Memorial Hospital, did you have any reason to believe they were lying to you?

MR. BRYAN:  Speculation.

THE COURT:  Overruled.

THE WITNESS:  I didn't understand why they would not treat her.  Because we've had troubled inmates out there before.

**Q.** (BY MR. MOON)  This was a new situation; correct?

**A.** Correct.

**Q.** When Sheriff Park got there, did he ever say to you, "Christie, I disagree.  Ms. Crowell is fine.  Accept her into the jail"?

**A.** He did not say that to me.

**Q.** Did he say that he thought Ms. Crowell was okay?

**A.** He did not say that either.

**Q.** Did he ask the Hugo officers why they couldn't take Ms. Crowell back to the hospital?

**A.** I believe he did.

**Q.** And what did they say?

**A.** The hospital won't see her.

**Q.** That she punched a nurse?