**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

KYLE ENDICOTT, as Special                )
Administrator for the Estate             )
of Jennifer Crowell, deceased,           )
                                         )
          **Plaintiff**,                   )
                                         )
   vs.                                   )   No. 21-CV-319-JAR
                                         )
TERRY PARK, in his official              )
capacity as Sheriff of                   )
Choctaw County,                          )
                                         )
          **Defendant**.                   )
_____        )

**JURY TRIAL TRANSCRIPT**
**BEFORE THE HONORABLE JASON A. ROBERTSON**
**UNITED STATES MAGISTRATE JUDGE**
**FEBRUARY 6, 2026**

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription.

Jessyca Guerra, CSR
Federal Official Court Reporter
P.O. Box 607
Muskogee, Oklahoma 74402

UNITED STATES DISTRICT COURT -- OFFICIAL TRANSCRIPT

**EXHIBIT 3**

A.    Yes, sir.

Q.    What are we looking at here?

A.    2.03, Condition of Inmate, page one, Plaintiff's Exhibit 15.7.

Q.    This was a policy here at the Choctaw County Jail; correct?

A.    Yes.

Q.    And this was in place on June 26, 2020; correct?

A.    Yes.

Q.    Now, if you look at the policy itself, the policy language, what does this policy -- what is it designed to do?

A.    What does it what, sir?

Q.    What is it designed to do?  What's the intent of this policy?

A.    It says no person shall be admitted to the facility in an unconscious state or with any evidence of serious illness or injury.

Q.    Are you aware of any training that's provided to staff on what is considered evidence of serious illness or injury?

A.    In reference to jailers?

Q.    Yes, sir.

A.    Yes, they have training in it.

Q.    Okay.  You were here for the testimony of Ms. Terry-Ball yesterday; correct?

A.    Yes.

with somebody with a serious illness or injury; correct?

A.    Which one is it, sir?

Q.    That would be subsection two.

And what, according to your policy, is a jailer supposed to do if somebody is presented with evidence of serious illness or injury?

A.    I'm sorry.  Can you ask me again?

Q.    Sure.  What is your jail staff supposed to do if they are presented with an inmate or an arrestee with evidence of serious illness or injury?

A.    They are to speak to the jail administrator.

Q.    What else are they supposed to do?

A.    Are you talking about -- are you talking about someone being brought into the jail?  Is that the question?

Q.    Yes, sir.  This policy would apply in the situation where somebody is brought into your facility, an arrestee; correct?

A.    Yes.

Q.    Okay.  And so, if an arrestee is brought into your facility and they exhibit evidence of serious injury or illness, what does this policy direct the jail staff to do?

A.    Not to accept custody until the arresting officer provides documentation of inmate's medical treatment.

Q.    Okay.  And so, you would need to refuse custody; correct?

A.    Yes.

Q.    And require documentation of the inmate's medical

clearance; correct?

A.    Yes.

Q.    In this particular case, your jail would require a medical clearance for somebody who is out of it, so to speak.

A.    Yes.

Q.    Okay.  And your policy would require a medical clearance for somebody, an arrestee who couldn't talk or couldn't talk coherently; correct?

A.    Yes.

Q.    And you heard your jail administrator testify yesterday that inability to walk and inability to talk would require a medical clearance at your jail; correct?

A.    Yes.

Q.    And do you agree with her?

A.    Yes.

Q.    She also testified that following policy is mandatory. Did you hear that testimony?

A.    Can you repeat the question?

Q.    Sure.  Did you hear her testify that following policy is mandatory?

A.    Yes.

Q.    And that's mandatory even for the sheriff; correct?

A.    Yes.

Q.    I want to look at another policy.  This is Policy 2.11. It's Plaintiff's Exhibit 15.15.

Can you identify this policy?

A.    Surveillance of Holding Cells?

Q.    Yes, sir.

This is a policy at your facility; correct?

A.    Sir?

Q.    This is a policy at your facility; correct?

A.    Yes.

Q.    Okay.  And this is a policy that governs people that are placed in a holding cell; correct?

A.    Yes.

Q.    And this would have applied to Jennifer Crowell in a holding cell; correct?

A.    If she had been an inmate, yes.

Q.    Okay.  And down at the bottom, is says for inmates that may be suicidal, assaulted, or in need of medical observation, the receiving deputy shall -- a, b, c -- and d says, "Observe the holding cell every 15 minutes or more frequently if necessary."

Did I read that correctly?

A.    Yes.

Q.    This policy doesn't require the removal of any clothing, does it?

A.    That doesn't, no.

Q.    Okay.  So you have a policy at your facility for an individual who may require increased frequency of supervision

for medical reasons, and that would entail 15 minutes of observation -- or observation every 15 minutes; correct?

A.   Yes.

Q.   And it would not require the removal of any clothing; correct?

A.   Yes.

Q.   Let's look at another policy.  This is Plaintiff's Exhibit 15.27.

Can you identify this document, Sheriff Park?

A.   Yes.

Q.   Under here, under procedures, it says, "The Director of Medical Services at the Detention Center is a medical doctor licensed in the State of Oklahoma and shall be referred to as the Facility Physician."

Did I read that correctly?

A.   Yes.

Q.   Did you have a medical director?

A.   No.  We had tried for 13 years to get someone to take a position such as that, and 16 years under Sheriff Collins to try to obtain someone.  And anytime that you speak to a doctor or an RN, you couldn't -- once they found out they were going to have to talk to the inmates, they would not accept it.

Q.   You never reached out to Turn Key Health Clinics, did you?

A.   I'm not sure.

Q.   That's a company that provides medical staffing.

booked into the facility and had a medical clearance.

MR. BRYAN:  No one has been able to produce a booking or medical clearance.  He can testify all he wants that that's the case, but nobody ever produced it.

THE COURT:  Well, in this particular case, we are still talking about Ms. Crowell and whether there was deliberate indifference related to her and her civil rights. What happened with Mr. Legros does not prove anything on this particular day.

So, just the same as I had already previously ruled on my motion in limine.  Otherwise, we're going to have a mini trial on each and every single one of those.

So that objection will be sustained.  We're not going to talk about Mr. Legros.

MR. BRYAN:  Okay.

Q.   (BY MR. BRYAN)  Sheriff, is it the practice at the jail to divert people who cannot go through the booking process because of intoxication back to a cell so that they can sober up before they can have their mugshot taken and go through the booking questionnaire process?

A.   No.  You have to do some type of book-in before taking an intoxicated person back to a holding cell.  I mean, you just don't walk them in.  If they're being accepted as an inmate, you do not just walk them in and put them straight back into a cell if they are being booked in.

Q.    And this happens routinely; right?

A.    Do what?

Q.    This happens routinely?

A.    Where they're brought in intoxicated?

Q.    Right.

A.    Yes.

Q.    You bring an intoxicated person in, and then you take them and you put them in a cell, and you wait until they sober up; correct?

A.    No.  Before you do book-in?

Q.    Right.

A.    No.

Q.    That's never happened?

A.    No.

Q.    I want you to look at your deposition, page 59, lines two through ten.

"QUESTION:  Okay.  Is it the practice at the jail to divert people who cannot go through the booking process because of intoxication, combativeness, whatever, back to a cell and wait until they sober up before taking them through the booking process?

"ANSWER:  I'm sure that it has occurred.  As far as when or who or why or who, I have no idea."

Did I read that correctly?

A.    That may be the answer in which I gave at that time, but

UNITED STATES DISTRICT COURT -- OFFICIAL TRANSCRIPT

they do not just walk in and take them straight to a cell. There has to be some type of questions or something said before they go to that holding cell to sober up.

THE COURT:  And, Sheriff, I'm just going to remind you, too, to answer the question that he asks you, and then your attorney can ask you follow-up questions later.  But if you will, listen directly to his question and answer that question, sir.

MR. BRYAN:  Thank you, Judge.

Q.   (BY MR. BRYAN)  Sheriff, at your facility, you bring intoxicated people off the street, and you put them in a cell to sober up until they can go through the booking process; correct?

A.   No, sir.

Q.   You just testified in your deposition that "I'm sure that has happened."

A.   I'm not saying that it hasn't happened, but that is not -- that is not the way -- the operation.

Q.   Okay.  But you know that happens; right?

MR. MOON:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  No, sir.

Q.   (BY MR. BRYAN)  You said, "I'm sure it happens," and now you're saying that "I don't know that it happens"?

A.   Anything can happen, yes.  Is that the way operations

should be going?  No.

Q.   But you know it happens.

A.   Not true.  I'm saying that it could have happened.  But do I know of instances?  No, sir.

Q.   You said you know it has happened.

MR. MOON:  Objection.  Asked and answered.

THE WITNESS:  I don't -- I don't agree with that, no, sir.

THE COURT:  Overruled.

Q.   (BY MR. BRYAN)  So you're unsure that it happened?

A.   I'm saying that it could have happened.  I'm saying that is not how it should be.

Q.   Okay.  Knowing that it could have happened, have you done anything to create any policy-based guidance for anybody on how to handle people in that situation?

A.   Speaking with the jail administrator, they would be -- she would advise her jailers or correctional officers that they need to get some type of information from that intoxicated person but they take them on back to a holding cell.

Q.   Sir, the question was, did you have any policy-based guidance for people in that situation?

A.   No, sir.

Q.   Do you believe that's dangerous?

A.   Do what?

Q.   Do you believe that's dangerous?

**A.**    They know through their jail administrator advising them, sir, that they are to have some type of questions or clear that person of any objects before they take them back to a holding cell.

**Q.**    Sir, that's not my question.

**A.**    I'm sorry.

**Q.**    My question is, do you believe it's dangerous to have a situation where you know people are intoxicated going back to a cell and there is no policy guidance to tell people how to manage them?

MR. MOON:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  No, sir.

**Q.**    (BY MR. BRYAN)  You don't believe that's dangerous?

**A.**    No, sir.

**Q.**    Was Jennifer Crowell being moved back to cell four to see if she would get better or worse?

**A.**    Jennifer Crowell was moved back to cell four to get her away from the front entrance of that booking area.  Which, people come from the courthouse, or bondsmen, or pastors walk right into that door to make entrance.  I did not feel that Ms. Crowell should be sitting there with those people around while she's trying to kick at some of the officers.

**Q.**    Sheriff, your deposition, page 96, lines 19 through 24, the question was:

"Okay.  And why is that?

"ANSWER:  She was just moved back there to see if she would either get better or get worse.  If she'd gotten more coherent, then, yes, she would have been brought back out and tried to do a book-in process, but Ms. Crowell -- Ms. Crowell didn't get better."

Did I read that correctly?

A.   Yes, sir.  That was said.

Q.   All right.  You sent her back there to see if she would get better or get worse.  That's what you testified to; correct?

A.   Yes.  Ms. Crowell was sent back there until she could be found somewhere to go because Hugo Police Department said that the hospital had kicked, and they did not want her there, and I was not going to put this woman out on the street or somewhere until they could find somewhere to take her to another hospital.

Q.   And knowing that you've sent her back there to either get better or get worse, if she gets worse, you have separated her further from medical care; correct?

A.   No, I have not.  We had to find -- or they had to find medical care for Ms. Crowell because she didn't -- or wasn't able, under the officer's testimony, to go back to that hospital.

Q.   Do you believe taking her further into the secured

perimeter of the jail brought her closer to medical care?

A.    It did not take her further away from medical care.  I mean, Deputy Gibbs was there as an EMT.  She was never left alone once she was moved to cell four.  As soon as she hit cell four, she starts deteriorating to a worser state.

Q.    When you moved Jennifer back to cell four, you didn't know whether she was going to get better or worse, did you?

A.    No, sir.

Q.    You took the gamble with her that she would get better and not worse; is that right?

A.    I would not call it a gamble.  It was to get her somewhere away from that front door until a place she could be taken to to get medical treatment, because of the officers saying that she could not go back to that hospital.

Q.    Sheriff, before you even arrived at the jail, your jail administrator communicated to you that Jennifer was out of it; right?

A.    Yes.

Q.    And that she was unable to talk plainly; correct?

A.    Yes.

Q.    So you agree that before you arrive, your jail administrator has communicated at least two reasons why Jennifer Crowell can't be accepted to your facility; correct?

A.    Yes.

Q.    And in that moment, you did not instruct your jail

hospital; correct?

**A.**    That is correct.

**Q.**    And she told you that Jennifer Crowell didn't need to be booked in; right?

**A.**    Yes, she did.

**Q.**    Now, do you have a specific recollection of anyone ever saying that the hospital refused to see Jennifer Crowell?

**A.**    Yes.  Sedrick Frierson, who was a patrolman for Hugo Police Department, made it real clear that they were not to take her back out there, that they at the hospital was through with her.

**Q.**    I want to look at your deposition, page 107, lines three through eight.

    "QUESTION:  Okay.  Did anybody -- do you have any specific recollection of anyone ever saying that the hospital refused, using that word, 'refused,' to see her?

    "ANSWER:  As my understanding from one of the officers, that they wanted her removed from the premises."

    Did I read that right?

**A.**    From the hospital?

**Q.**    Yeah.

**A.**    Yes.

**Q.**    Now, there's a difference between "removed" and "refusal." Those are different words; correct?

**A.**    Removed means to get out of there or to get them out of

**A.**   Yes, it is.

**Q.**   And is this a record that's kept in the regular course of operation of the sheriff's office by a person with personal knowledge?

**A.**   Yes.

MR. MOON:  I'd move to admit Defendant's Exhibit 42, Your Honor.

THE COURT:  Any objection at this time?

MR. BRYAN:  106 and 602.

THE COURT:  All right.  That objection will be overruled.

Defendant Exhibit 42 shall be admitted.

**Q.**   (BY MR. MOON)  Sheriff, I would like to turn to page 31 of your training file, Defendant's Exhibit 42.

**A.**   Thirty-one?

**Q.**   Thirty-one.

MR. MOON:  Your Honor, I would ask permission to publish Defendant's Exhibit 42, page 31.

THE COURT:  You may do so.

MR. MOON:  Shawna, if you could callout the bottom third of that, pretty much.

THE WITNESS:  I am not on that page, if that's what...

**Q.**   (BY MR. MOON)  That's okay, Sheriff.  We'll go through it. Look at your screen.  Sheriff, your screen right there.

A.    Yes.

Q.    And do you see May 20, 2019?  Do you see that date?

A.    Yes.

Q.    Do you see you received four hours of mental illness training?

A.    Yes.

Q.    And then, on October 8, 2018, you had received four more hours on mental illness.

A.    Yes.

        MR. MOON:  I want to go to page 32 of Defendant's Exhibit 42, and we'll do the top half, Shawna.

Q.    (BY MR. MOON)  Do you see, on June 20, 2017, you had four more hours of mental illness training?

A.    Yes.

Q.    And then, on August 14, 2015, you had training, four hours, in basic supervision and management.

A.    Yes.

Q.    And then, on August 12, 2015, you had Writing Policy for Jail, two hours.

A.    Yes.

Q.    Do you see there on August 13, 2014, you had training in emergency procedures, one hour; and then on May 30, 2014, you had 12 hours of jailer training; and on December 18, 2013, you had four hours of mental health treatment and services?  Do you see those?

A.    Yes.

Q.    Do you see, on June 13, 2013, you had training in inmate programs?

A.    Which one?

Q.    Right there.  She's highlighted it.

A.    Oh.  June 13, 2013?

Q.    Yes, sir.

A.    Yes.

Q.    And then, on May 15, 2013, you had another 23 hours of jailer training.

A.    Yes.

Q.    And then, at the bottom there, February 8, 2011, you had another 25 hours of jailer training.

A.    Yes.

Q.    Sheriff, how long have you been in law enforcement?

A.    Almost 39 years.

        MR. MOON:  Shawna, let's go to page 35 of Defendant's Exhibit 42.

Q.    (BY MR. MOON)  Sheriff, I'm not going to walk you through 35 years of training records, pointing out every single time you had training on jail policy writing or jailer training or mental health, or all of that.

        I'm just going to go and look at this record, which is page 35, and it goes all the way back to February 9, 1987, and February 10, 1987.  You had first aid and CPR.

A.    Yes.

Q.    And then, at the very bottom there, December 15, 1995, mental health training, one hour.

A.    Yes.

Q.    Have you had mental health training throughout your 33-year career as a law enforcement officer?

A.    Yes.  That is a requirement that the State requests that you do.  They're mandatory.

Q.    Have you had training on writing policies in jails and training as a jailer, even, completing jail schools?

A.    Yes.

Q.    And that's reflected here in Defendant's Exhibit 42, isn't it?

A.    Yes.

Q.    You heard Christie Terry-Ball testify yesterday that jailers were trained on first aid; correct?

A.    Yes.

Q.    And you heard her testify that that training included training on seizures, heart conditions, and breathing conditions; correct?

A.    Yes.

Q.    Was that testimony correct?

      Was that testimony, as far as those jailers, not yourself, Sheriff -- sorry -- true; correct?

A.    Yes, the jailers.

**Q.** Would that training be helpful for a jailer in identifying if an individual was experiencing a serious medical issue?

MR. BRYAN: Leading.

THE COURT: Overruled.

You can answer.

THE WITNESS: Would you repeat the question?

**Q.** (BY MR. MOON) I can. Would that training on first aid and seizures and heart conditions and breathing be helpful to a detention officer who is booking somebody into the jail to know whether or not they were experiencing a serious medical condition?

**A.** Yes.

**Q.** Tell me about the booking process at the jail. What happens when an inmate is to be booked in? What's the first thing?

**A.** The first thing is the jailer/correctional officer goes out to the front of the book-in window, patting them down, checking them. There is a series of questions that are screening that they have to do for medical before they go into any part of the book-in of the charges or information of the person.

**Q.** Does the arresting officer have to present charges or an arrest affidavit?

**A.** Yes.

**Q.** Can they just verbally tell the jail, "We're arresting her

UNITED STATES DISTRICT COURT -- OFFICIAL TRANSCRIPT

for assaulting a nurse at the --

**A.** No.

**Q.** -- hospital"?

Was that a no?

**A.** Sir?

**Q.** Was that a no?  I'm sorry.

**A.** I'm sorry.  Repeat the question.

**Q.** That's okay.  I'm trying to speak into the microphone, Sheriff, and I apologize if I leaned back a little.

Can an arresting officer just verbally tell the jail, "I'm arresting this woman on assault of a nurse at the hospital"?

**A.** The first thing they would have to do before they even give their affidavit would be to give them a citation and hand it to that jailer.

**Q.** Where do you send inmates at the Choctaw County Jail for medical clearance?

**A.** Medical clearance would be Choctaw Memorial Hospital, which is approximately nine blocks east of the county jail.

**Q.** And have you ever in 33 years had the hospital refuse to provide a medical clearance?

**A.** That is a first.

**Q.** And have you ever had to send an inmate anywhere else for a medical clearance?

**A.** No, we do not.

**Q.** What is the next closest facility that could potentially

provide a medical clearance to you?

**A.**    It would be Pushmataha County, which is approximately 20-plus miles northwest of Hugo.  It takes about 25 minutes, maybe.

**Q.**    What about after Pushmataha?  What's the next closest?

**A.**    The next one would be to the east, which would be Idabel, which is 48 miles.  The next, to the west, would be Durant, which is 55 miles.

**Q.**    And so, Sheriff, if you, when you were called by Ms. Terry-Ball, ran into the entryway of the jail, and drug Ms. Crowell out into the parking lot and took her yourself to a medical clearance, what's the fastest that it's going to be that she's going to be there?

**A.**    Running lights, code, we could probably make it to Pushmataha County in 22 minutes, 23 minutes at the most.

**Q.**    You heard Bob White testify that he understood Ms. Crowell was no longer able to be treated at Choctaw Memorial Hospital as well.

            MR. BRYAN:  Leading.

            THE COURT:  Overruled.

            THE WITNESS:  Would you repeat the question?

**Q.**    (BY MR. MOON)  Sure.  You heard Officer Bob White -- Lieutenant Bob White testify he understood Ms. Crowell was no longer able to be treated at the hospital.

**A.**    That is correct.

Q.    And that's what Officer White and Officer Frierson conveyed to you in the entryway of the jail; correct?

MR. BRYAN:  Leading.

THE COURT:  Overruled.

THE WITNESS:  Both of them had made the comment. Frierson was more.  White was not as many times saying it as Frierson.

Q.    (BY MR. MOON)  Plaintiff's counsel has asked you several times during his direct examination of you why you didn't call the hospital.  And I want to ask you, did you have any reason to disbelieve Officer White or Officer Frierson?

A.    I would never question Officer Frierson or Officer White in anything that they do.  They are two of the best that's in that county.

Q.    That's your opinion of Officer White and Officer Frierson; right?

A.    It's as high as I could give a thought of an officer is them two are the best.

Q.    And you've heard the testimony that Officer White nor Officer Frierson knew that Ms. Crowell had had a seizure.

MR. BRYAN:  Leading.

THE COURT:  Overruled.

THE WITNESS:  Repeat the question, sir.

Q.    (BY MR. MOON)  You similarly heard Officer White and Officer Frierson say that they didn't have any idea that Ms.

Crowell had had a seizure.

MR. BRYAN:  403, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  There was never any comment made about medical conditions from Officer White or Officer Frierson.

Q.  (BY MR. MOON)  Sheriff, when you got to the jail and you made the decision that Ms. Crowell was going to wait in cell four while y'all figured out what to do, did you tell Christie Terry-Ball, "You're wrong and I'm overriding you?"

A.  I never questioned Ms. Terry-Ball.  She has done an excellent job.  This had nothing to do with overriding.

Q.  You agreed with her, she needed a medical clearance; correct?

A.  Yes, she did.

Q.  In response to some questions by plaintiff's counsel, you mentioned that there was a medical emergency in the entryway of the jail.  What did you mean by that?

A.  That I thought that Ms. Crowell was too intoxicated to come in, to be booked into the jail, or for me to take possession of.

Q.  And is that something where you call an ambulance immediately?

A.  No.  The arresting officer would be taking them back to wherever they could go to.

**Q.** Did you ever hear Ms. Terry-Ball say, "Terry, call an ambulance"?

**A.** No.

**Q.** Did you ever hear Dustin Gibbs say, "Sheriff, call an ambulance"?

**A.** No.

**Q.** Did you tell the Hugo officers that you thought Ms. Crowell needed to go back to the hospital?

**A.** Ms. Crowell needed to go somewhere, but they could not take her to Choctaw Memorial Hospital.

**Q.** How many times did you tell them, and how many times did they tell you that they could not take her back to Choctaw Memorial Hospital?

**A.** Made the --

MR. BRYAN: Hearsay, Your Honor.

MR. MOON: It's for notice and effect, not the truth of the matter asserted, Your Honor.

THE COURT: Overruled.

You can answer.

THE WITNESS: Repeat the question.

**Q.** (BY MR. MOON) How many times did you tell the Hugo PD officers that you thought Ms. Crowell needed to go back to the emergency room to be cleared, and how many times did they then tell you that she could not go back?

**A.** Officer Frierson was told approximately two times.

**Q.** On June 26, 2020, did you believe that the hospital had the ability to refuse treatment to a patient?

**A.** It's their building. Yes.

**Q.** What is your experience as sheriff and as a law enforcement officer with arrestees or inmates who are at the hospital?

**A.** The hospital -- the inmate is there to be treated, tests ran, medicine, whatever they may need to administer.

**Q.** Have you ever had the hospital administer Ativan or Haldol while you were sitting with a patient -- or an arrestee?

**A.** I have been out there with my jailer on multiple times in which that particular medicines that he just said has been administered to inmates that are climbing the walls, trying to go out the window, trying to stand up in the bed, and, yes, I've seen them give shots.

**Q.** How long are you or your officers then normally required to remain with that individual after those shots have been given?

**A.** The first round of shots, if they only give one round, you could be there anywhere from an hour and a half to two hours, maybe a little bit more.

**Q.** Have you ever seen a second round of shots given?

**A.** I have seen it, and that makes you stay there with that inmate longer, until they evaluate them or see how they're going to act.

**Q.** When Ms. Crowell was in the cell, and Deputy Gibbs said, "Call EMS," the first time, what did you do?

**A.** Immediately told someone there, Christie or one of them, to tell the comm center to call an ambulance.

**Q.** You didn't wait?

**A.** You don't wait. No, sir.

**Q.** You didn't think about whether you really needed an ambulance or not?

**A.** Repeat the question.

**Q.** You didn't think about it. You just did it.

**A.** I didn't hesitate. I was listening to Deputy Gibbs.

**Q.** Why rely on Deputy Gibbs for medical treatment or advice in this situation?

**A.** Deputy Gibbs was the only one I thought in there at that time that had any kind of EMT training.

**Q.** Prior to moving Ms. Crowell back to cell four, did you have any knowledge that she had had a seizure?

**A.** I had no idea.

**Q.** Did you have any knowledge that the hospital had no idea why she had had a seizure?

**A.** No, I did not.

**Q.** Did you have any knowledge that none of the orders that the doctor had made had been completed in order to figure out what was wrong with her?

**A.** No, I did not.

**Q.** Did you have any idea that she had been given the maximum dose of Haldol?

**A.** I knew nothing of that.

**Q.** And you didn't know that she had been given three doses of Ativan either?

**A.** No, I did not.

**Q.** You knew what those drugs where, and if somebody had told you, somebody in that entryway who knew about that had said, "Hey, by the way, they just gave her this shot, would --"

**A.** No one said such.

**Q.** Would that make a difference?

**A.** Yes.

**Q.** Had you ever in 33 years seen an EOD stopped because -- well, for any reason once it had been begun at the hospital?

**A.** No.  Once they have established or in the process of establishing that you are ED, you are transported to a state -- Carl Albert Mental Health.

**Q.** Plaintiff's counsel asked you a question at the end of his examination that approximately said, "Did your agency have any responsibility towards Ms. Crowell?"  And your answer was no; correct?

**A.** No.

**Q.** Did you feel responsibility as a human being towards Ms. Crowell?

**A.** Ms. Crowell was a human being.  Ms. Crowell was somebody's