**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

KYLE ENDICOTT, as Special )
Administrator for the Estate )
of Jennifer Crowell, deceased, )
)
        **Plaintiff**, )
)
  vs. )    No. 21-CV-319-JAR
)
TERRY PARK, in his official )
capacity as Sheriff of )
Choctaw County, )
)
      **Defendant**. )
                   )

**JURY TRIAL TRANSCRIPT**
**BEFORE THE HONORABLE JASON A. ROBERTSON**
**UNITED STATES MAGISTRATE JUDGE**
**FEBRUARY 3, 2026**

Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription.

Jessyca Guerra, CSR
Federal Official Court Reporter
P.O. Box 607
Muskogee, Oklahoma 74402

UNITED STATES DISTRICT COURT -- OFFICIAL TRANSCRIPT

**EXHIBIT 4**

people.  So I don't see that as a distinct event from what occurred prior.

MR. MOON:  I want to look at Joint Exhibit 1, pages six and seven.

Q.  (BY MR. MOON)  Going back to your clinical notes, Doctor, you wrote under "Progress and Procedures, Course of Care: Patient taken in police custody for observation at jail after punching/attacking nursing staff.  Patient is stable."

A.  Yes.

Q.  When you wrote, "Patient is stable," what did you mean by that?

A.  Simply that.  So the last time that I viewed the patient, as we've already discussed here, she was clinically stable, meaning she was able to talk.  She was protecting her airway. She didn't have any respiratory distress.  She had, you know, a blood pressure that wasn't hypotensive.  She was mentating.

So, again, that's, typically, from an emergency medicine perspective, what we mean when we say stable is the patient doesn't seem like they're in extremis or that they're in any immediate danger of death.

Q.  Have you ever heard of EMTALA?

A.  I have.

Q.  And what is EMTALA?

A.  So, EMTALA is the Emergency Medical Treatment and Active Labor Act.

UNITED STATES DISTRICT COURT -- OFFICIAL TRANSCRIPT

And so, it is a law that was enacted to prevent patient dumping, meaning hospitals refusing patients without insurance. And so, it basically says that if a person requests a medical screening exam, they're entitled to a medical screening exam, meaning an initial assessment, and they -- any initial stabilization or stabilizing treatment that they need, they're entitled to it if that facility is able to provide said treatment; if not, they are entitled to a transfer to a high-level care by an appropriate means.

Q.    Is it a violation of EMTALA to discharge or transfer a patient who is not stable?

MR. BRYAN:  Objection, Your Honor.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  So I would have to have you clarify because you're asking two different questions.

Q.    (BY MR. MOON)  Sure.  We'll go one at a time.

A.    Okay.

Q.    Is it a violation of EMTALA to discharge a patient who is not stable?

A.    So, someone who is not stable for discharge is sort of a complex issue, but it could be an EMTALA violation if they're not stable upon discharge.

Q.    So it is potentially a violation of EMTALA if that person is not stable upon discharge.

**A.**    Potentially.  Depending on the circumstances.

**Q.**    Was it potentially a violation of EMTALA if Ms. Crowell was not stable when she left the emergency room?

**A.**    So, I think the confusion you're making is that Ms. -- Ms. Crowell was not discharged.

**Q.**    Was she transferred, then?

**A.**    No.

**Q.**    What happened?

**A.**    She was taken by the police.

**Q.**    Do you think the Hugo Police Department took Ms. Crowell over Nurse Bullard's objections?

**A.**    I can't speak for Nurse Bullard, but as the physician, I never discharged that patient.

**Q.**    Would you have wanted the Hugo police officer to speak to you before taking Ms. Crowell to jail?

**A.**    I'm certainly open to them speaking to me in this situation, but, again, I did not discharge the patient.

**Q.**    For the sake of argument, if we call what happened to Ms. Crowell a discharge, would that have been a violation of EMTALA?

MR. BRYAN:  Speculation.

THE COURT:  Sustained.

**Q.**    (BY MR. MOON)  Did you make any phone calls to discuss the incident with Ms. Crowell on June 26, 2020?

**A.**    You'll have to clarify.

**Q.**   Did you call Teddy Rowland?

**A.**   I did call Dr. Theodore Rowland after the patient was transferred, yes, to apprise him of the situation, as he is the ED director at that facility.

**Q.**   And why did you call Dr. Rowland to report the incident with Ms. Crowell?

**A.**   So, as the director, he's entitled to know if there's been an unusual happening, a patient presentation twice in one day, any sort of -- any sort of concern, such as a patient taken without being discharged.  That would be an unusual happening, and so it would be appropriate to let the supervision of the emergency department -- or the ED director, in other words -- know.

**Q.**   Was there ever a complaint filed with the osteopathic board over your interactions with Ms. Crowell?

        MR. BRYAN:  Objection.  401.

        THE COURT:  Sustained.

        MR. MOON:  Judge, may we approach?

        THE COURT:  You may.

    (Bench conference on the record)

        MR. MOON:  Judge, the question regarding the osteopathic complaint, I mean, they're going to talk all day about how the policies of the jail were violated.  Well, this is his professional governing body, and if there was a complaint filed, and the outcome of that complaint, it goes to

his culpability in the outcome of Ms. Crowell.

THE COURT:  The last time I checked, the jail is actually on trial here.  They're the defendant.  So they have a burden to prove against the jail.  He's not a current defendant in this case, so how is that relevant at this time?

MR. MOON:  It's relevant because, if a jail [sic] is not supposed to discharge someone who is not stable, and they violate their duty to do that, but the sheriff believes that Ms. Crowell has been discharged pursuant to EMTALA, then he's operating under the assumption that five minutes ago, this person was stable.

THE COURT:  And Sheriff Park can certainly testify to that.

MR. MOON:  Well, he can't testify as to whether or not there was a violation of EMTALA, and if that's a fact or that's a fact for the jury to consider --

THE COURT:  Whether there's a question about an EMTALA violation is going to require an entirely different lawsuit.  That's not a legal issue that's in this particular case, especially with this particular defendant.

We are only here on a 1983 civil rights claim.

MR. MOON:  Thank you, Judge.  I just wanted to make a record.

THE COURT:  No, I appreciate that.

(Bench conference concludes)

Gordon?

**A.**   Yes, Kevin Gordon is an internal medicine physician at AllianceHealth.  I believe he has some sort of administrative position as well.

But, again, I would have to see their drug screen.  Drug screens can vary from institution to institution in their accuracy and completeness.  And so, possibly he thought that because theirs demonstrated those findings.  I don't know.  I can't speak for Dr. Gordon.

MR. MOON:  Shawna, let's go to Joint Exhibit 2, page eight, and let's go to the "Assessment and Plan:  Cardiac arrest."

**Q.**   (BY MR. MOON)  Doctor, under "cardiac arrest," it says, "Plan:  Unknown etiology of the cardiac arrest.  This could be related to a rhythm media caused by medications given at another facility or medications that the patient consumed prior to arriving at the facility."

Do you see that on the record?

**A.**   I do.

There's a lot of coulds and maybes and possibly.

**Q.**   Yeah.  Do you disagree, fundamentally, with that record, though?

**A.**   I do now.

**Q.**   You do now?

**A.**   With that first etiology of cardiac arrest, I do now.

Q.    Can you --

A.    I have an idea of what caused her cardiac arrest.

Q.    You what?

A.    I have an idea now of what caused her cardiac arrest.

Q.    When did you come to this understanding of what caused her cardiac arrest?

A.    After watching our video from my attorney at the jail.

Q.    Okay.  And this was a conversation with your attorney.

A.    This was after watching a portion of the video at the jail.

Q.    And had you watched that prior to your deposition in this case?

A.    I had not.

Q.    Are you sure about that?

A.    I -- I -- let me -- my remembrance is I had -- I had watched a very limited portion, possibly.

I've not seen the video in its entirety, certainly.  But my attorney is Lane Krieger, and I believe he showed me a very limited portion of the video.

Q.    I believe you testified previously that the video was not sufficient to make any diagnosis about a seizure; is that correct?

A.    Since the deposition, I've had an opportunity to review the depositions of expert witnesses and their view of the video as well.  And so, it's made me have an opinion now as well.

Q.   What expert witness have you reviewed?

A.   So, discussing with my attorney, Lane Krieger, he obtained an expert witness evaluation --

THE COURT:  Counsel, will you-all, please, approach?

(Bench conference on the record)

MR. MOON:  Judge, I don't know what he's doing with his attorney-client privilege.

THE COURT:  I have all types of concerns, but I'm not hearing any objections.

So you're okay with these questions being asked?

MR. BRYAN:  I mean, if he's going to render a cause of death pending based on the body-worn camera, absolutely. I'm not going to object to that.

MR. MOON:  Yeah, I'm not going to ask that.

THE COURT:  Okay.  I'm just making sure the record's clear that we have no objections to these questions that are being asked.  That's fine with me.

So, proceed with caution.

MR. TERRILL:  It would be my input, and it's certainly not my witness and not my place to make the objection, but it would be my input that somebody might be in the best interest to advise him about his client privilege, his attorney-client privilege.

THE COURT:  Well, he obviously is represented by counsel and has been.  His counsel could have been here to

present him.

MR. TERRILL:  I'm just throwing that out there.

THE COURT:  I appreciate that.  That is not a Fifth Amendment right, though.  So, if it was a Fifth Amendment right, I would be advising him, but I am not going to be giving him legal advice from this bench.  I'm just saying that I'm calling all attorneys up here out of caution because I believe we are on an extremely slippery slope right now.

But if you-all aren't objecting to it, then so be it.

MR. BRYAN:  At least not at this point.

THE COURT:  So be it.

(Bench conference concludes)

Q.   (BY MR. MOON )  Dr. Hogan, I have no interest in asking questions that violate your attorney-client privilege, and I just want you to understand that.  Do you understand that?

A.   Thank you.  Yes.

MR. MOON:  Thank you, Dr. Hogan.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MR. BRYAN:  Briefly, Your Honor.

### REDIRECT EXAMINATION

BY MR. BRYAN:

Q.   Doctor, you're not here as an expert witness; correct?

A.   That's correct.

Q.   You're not being paid for your testimony by either side;

correct?

**A.**   I am not, no, sir.

**Q.**   You indicated in your discussions with Mr. Moon that you had a new opinion as to the cause of death of Ms. Crowell; is that correct?

MR. MOON:  Objection, Your Honor.  He's not here as an expert.  He's not testifying as an expert nor has he been qualified as one.  It's outside the scope.

THE COURT:  Please approach.

(Bench conference on the record)

THE COURT:  Mr. Bryan?

MR. BRYAN:  This was elicited on direct examination.

THE COURT:  Well, he didn't actually solicit his opinion.  He stopped short of where he was going, but you did pull that out on your cross.

MR. MOON:  Judge, here's the other things:  If he has now come up with this new opinion since he has settled in this case, I think that becomes incredibly relevant to his credibility and his bias.

THE COURT:  I think we definitely are crossing into some territory that this Court needs to take a little bit closer look at.

So what we are going to do is adjourn for the day, and Dr. Hogan can come back tomorrow morning, and we'll start the re-cross at that point.  That way, we can reserve these issues.

UNITED STATES DISTRICT COURT -- OFFICIAL TRANSCRIPT

We'll address them tomorrow morning, and I can look a little deeper into that at this point, because, as I told you-all before, slippery slope.

All right.  You all take your seats, and I'm going to excuse the jury and order him back tomorrow.

(Bench conference concludes)

THE COURT:  Ladies and gentlemen, it is now 4:20 in the afternoon.  Based upon some other obligations the Court has, and due to the possible length of time that we may still be with this witness, we are going to adjourn for today.

Let me ask, specifically Mr. Clark and Mr. Wilson, because you-all drive the furthest, is starting at nine o'clock a.m. okay for you-all?  I don't want to inconvenience you that much.

JUROR WILSON:  I'm staying here tonight.

THE COURT:  Okay.

JUROR CLARK:  I also have a hotel room here.

THE COURT:  Then we will start exactly like we did yesterday.  If you-all can be here by 9:00, we will start just as close as we can to that once you arrive.

You are not to discuss this case with anyone or each other.  You must not investigate any aspect of the case on your own, and you are not to reach any conclusions until the case has been presented.

If everyone will remain seated.

You may now exit for the day.  Thank you.