Dear Commissioners,

I am writing you now because you deserve to know the truth that has been hidden from you for a very long time.  I have nothing but the utmost respect for each and every one of you. I have tried my best to serve you in the most honest, ethical, responsible and professional way possible. I was threatened with termination on Tuesday, January 6, 2015, after a month of the silent treatment from your Executive Director because I dared to tell you the truth and I dared to try and make ACCO-SIG/SIF better programs.  The silent treatment has begun once again, and I fear that I will be terminated before having the proper opportunity to tell you, my bosses, how ACCO and ACCO-SIG/SIF are actually operated. I apologize in advance, but this is a lengthy and thorough analysis. I highly recommend that you read it in its entirety.

As an attorney, I have an ethical duty to make you aware of the operational deficiencies and problems I have witnessed and tried to rectify to no avail.  I have tried at length to correct the problems through discussions/meetings or correspondence with the Executive Director, but I have been shut down at every turn. As stated, I was threatened with termination in January. I have a family of 5 that I must support, but I will not compromise my legal license for the incompetent, unethical and potentially illegal behavior of a few.  I cannot stand idly by any longer while public funds are methodically wasted which could jeopardize ACCO-SIG's entire surplus and viability.  ACCO-SIG is a tremendous county asset and your Executive Director is on the verge of destroying it.  I have an obligation to tell you the truth and keep you informed regardless of the fact that if I do, termination will likely result. I hope each of you understand the gravity of the situation and will take the time to reexamine everything you know about ACCO and ACCO-SIG/SIF, and likely everything you have been told by your Executive Director.  I have tried my hardest to handle this matter internally.

First, it is important to remember that ACCO-SIG/SIF is funded entirely with taxpayer monies, and ACCO is funded 99% with taxpayer monies.  I have been saying "taxpayer money" non-stop for the last 5-6 months.  I am sure some of you are tired of hearing it. I believe ACCO's only private funds are vendor dues from conferences. In short, all three entities are governmental entities.  They are not private enterprises. ACCO-SIG has been declared a governmental entity by the Supreme Court of Oklahoma. I know – I defended ACCO-SIG in the lawsuit. It is my opinion that ACCO is also a governmental entity because it is funded almost entirely of public funds. I believe a Court of law would reach the same conclusion if that issue was litigated. Regardless, taxpayer monies should be spent in the most efficient and economical manner possible. As employees of ACCO, we have a duty to protect your county's money to the best of our ability.

1

Exhibit 1

## ACCO-SIF

My discussion will primarily focus on ACCO-SIG as it is the true self-insured risk pool. ACCO, on behalf of ACCO-SIF simply handles claims for CompSource.  In other words, ACCO, on behalf of ACCO-SIF is only a third-party administrator, not a true self-insured risk pool like ACCO-SIG. ACCO-SIF pays premiums to CompSource, and then obtains a rebate to handle the workers' compensation claims that arise from our member counties. The taxpayer monies handled by ACCO's adjusters (on behalf of ACCO-SIF) pales in comparison to the money handled by ACCO-SIG. ACCO employs four dedicated claims adjusters to handle workers' compensation claims and one part-time employee.

## ACCO-SIG

ACCO-SIG was created in December 1986. ACCO-SIG insures the property and liability risks in 74 of 77 Oklahoma counties.  It is my understanding that from 1986 to approximately 1999, ACCO-SIG used Willis as its third-party administrator to handle its claims.  In 1998 or 1999, ACCO-SIG brought its claims handling in house.  ACCO-SIG entered a third-party administrator agreement with ACCO around the same time and ACCO d/b/a County Claims was formed.  ACCO hired claims adjusters, namely Denny Butler and Jim Dougherty, to handle its claims. Dusty Birdsong was the Programs Administrator. Mr. Birdsong, Mr. Butler and Mr. Dougherty are still employed in their respective positions to this day.

As most of you know, Dusty Birdsong left ACCO in approximately 2005 and was subsequently re-hired by the current Executive Director in 2007 to primarily underwrite and renew the policies each year.  When he returned in 2007, ACCO-SIG was in dire straights financially.  The program was approximately $5 million in the red.  As a result, Mr. Birdsong changed the underwriting methodology to a more sound system which provided a more accurate actuarial analysis. The end result was year-over-year increases in premiums to account for the actual risks being insured by ACCO-SIG.  Mr. Birdsong made the correct decision and did the right thing.  However, premium increases can only cover up poor operational and claims handling issues for so long.

Through the third-party administrator agreement, ACCO's Executive Director has primary responsibility for the day-to-day operations of ACCO-SIG. That responsibility necessarily includes the ethical and fiduciary duties associated with the expenditure of taxpayer monies and the operation of a governmental entity. Since 2007, your current Executive Director has been tasked with those duties.

Because self-insured risk pools are complex and sophisticated financial entities that utilize taxpayer monies, the cornerstone of any program must be transparency and arms length

2

Exhibit 2

transactions so the public is confident in the entity and product. Most self-insured risk pools employ <u>multiple</u> in-house attorneys to protect the pools' interests and ensure the proper handling of claims and lawsuits. In fact, I have never encountered a self-insured risk pool the size of ACCO-SIG that did not employ multiple staff attorneys. For example, OMAG (Oklahoma Municipal Assurance Group – an entity in Oklahoma identical to ACCO-SIG) employs at least 4 attorneys in-house. The proper handling of claims and lawsuits minimizes waste and maximizes efficiency and economy. The proper handling of claims and lawsuits is one of the few things a self-insured risk pool like ACCO-SIG can control, typically through the use of litigation guidelines.

Thus, the proper handling of claims and lawsuits is a key element to the survival of any governmental entity like ACCO-SIG. That is because litigation expenses are the primary expenses associated with these programs. As a result, programs like ACCO-SIG have multiple layers of internal checks and balances and policies and procedures in place so that employee decisions related to claims and litigation are examined and reviewed by managers, attorneys and supervisors to maximize efficiency.

Please understand, ACCO-SIG is a multi-million dollar governmental entity. In the 2013-2104 policy year, ACCO-SIG brought in premiums of roughly $7.5 million dollars and deductible funds of approximately $500,000-$1 million. The deductible funds are your county funds that sit in your deductible fund account at ACCO-SIG until a claim is made. In 2013/2014, ACCO-SIG paid ACCO approximately $226,000 in royalty fees and $740,000 for its third-party administrator agreement (in 2013/2014, ACCO-SIF also paid ACCO a tpa fee of approximately $500,000-$600,000+). In total, ACCO-SIG spent roughly $1.34 million on estimated expenses from the $7.5 million in premiums for the 2013/2014 policy year. Further, ACCO-SIG spent approximately $1.35 million in reinsurance premiums to CRL. Thus, ACCO-SIG spent roughly $2.7 million in fees and expenses in the 2013/2014 policy year prior to any claims being touched. Thus, the premiums of $7.5 million have already been reduced to roughly $4.8 million. Although litigation fees are spread out and applied to various accounting years depending on the date of loss, ACCO-SIG spent $3,775,377.04 (includes estimated $140,000 in court reporting fees) in litigation related expenses in the 2013/2014 policy year. The majority of those fees were paid to the Collins, Zorn, & Wagoner law firm on the second floor of the ACCO-SIG building – a government owned building.

For your information, from 2004-2014, ACCO-SIG has paid Mr. Collins' firm $18,267,353.06. The remaining firms that have received funds from ACCO-SIG during that ten year period are: Pierce, Couch - $2,698,253.66 (only used when conflicts arise); David Lee - $968,899.47 (business related to Cleveland, McClain and Garvin counties); Frailey, Chaffin - $136,560.98; Lytle, Soule & Curlee - $43,195.81; and Goolsby, Proctor, Heefner & Gibbs - $43,005.28.

3

Exhibit 2

I have a deep appreciation, understanding and passion for ACCO-SIG because of my representation of the entity in suit. I was elated when approached by your Executive Director for the position of ACCO-SIG/SIF's first General Counsel. I believed my representation of ACCO-SIG in litigation was the reason I was hired in March 2014. I was told by the Executive Director that my job responsibilities were operational oversight of the insurance programs, and I am aware that the ACCO-SIG Board was given a list of my responsibilities/duties. Even though I was hired for that purpose, I can tell you that the Executive Director has never provided me with any operational control or oversight authority. I have never been granted the duties/responsibilities on the sheet of paper the Executive Director provided you and used to promote the position and ultimately my job. I have since learned that the Executive Director will never relinquish any operational control of ACCO-SIG because she thrives on the power. I have also learned, unfortunately, that the Executive Director likely had an ulterior motive in hiring me.

From the very beginning, it became clear to me that something was off, that something was not right. Initially, that was due to the fact that the Executive Director was never at work – literally, she may have made it into work 1 day in the first three weeks of my hiring. Even when she finally showed up, she never explained to my co-employees who I was, why I was hired, or why I was there. Needless to say, I initially felt lost. I blamed it on the change in scenery. My job responsibilities were not explained, and I was not officially introduced to my co-employees until several months after I was hired.

During the first several months, I worked at length revising and updating ACCO-SIG/SIF's Bylaws and Articles of Association and Coverage Agreement. That was an extensive project as the policies were antiquated and had not been updated in years. I also attended two business trips – (1) a trip to Alabama to attend an annual board meeting of County Re Limited ("CRL"), ACCO-SIG's re-insurer (ACCO-SIG has equity ownership in CRL; CRL is a re-insurer comprised of entities like ACCO-SIG from across the country that only insure counties); and (2) a trip to Long Beach for a PRIMA (risk management) convention. I have learned that the CRL meeting in Alabama was the first CRL meeting the Executive Director ever attended since CRL became ACCO-SIG's re-insurer in 2008/2009 (roughly 6 years). That trip was also the first time I recall seeing the Executive Director after I was hired in March. And as some of you are aware, the Executive Director displayed unprofessional conduct in Long Beach which leads me now, after knowing everything that I do, to conclude that she did have ulterior motives when hiring me. I have witnesses and a text message apology to prove it.

During these initial months, I also worked extensively on ACCO legislation and individual legal issues raised by county commissioners across the state. When I returned from Long Beach, I really started looking at ACCO-SIG's claims and ACCO-SIG's internal operational

4

Exhibit 2

structure with respect to how ACCO-SIG's claims and lawsuits were handled by Mr. Butler and Mr. Dougherty.  What I learned was frightening.  The entire ACCO-SIG operation was set up for <u>inefficiency</u> as opposed to <u>efficiency</u>.  I discovered the following issues. Most of these issues support inefficiency and ultimately lead to increased litigation expenses and the waste of taxpayer monies:

1. There are literally no checks and balances or accountability measures in place with respect to the decisions Mr. Butler and Mr. Dougherty are making on the claims and lawsuits they are handling. Each claims handler makes decisions on their own unchecked. Mr. Butler's and Mr. Dougherty's decisions directly correlate to the expenditure of thousands of dollars of taxpayer monies. However, there is no oversight of these decisions and no one is accountable to anyone. Mr. Birdsong's  primary responsibility is renewing the policy. Thus, he did not interfere with the handling of claims and/or lawsuits; Mr. Butler primarily handled litigated claims, reservation of rights letters, payment (and auditing) of attorney bills related to lawsuits, etc.; and Mr. Dougherty primarily handled pre-suit claims and minor litigation (Roy from the ACCO-SIF side occasionally handles minor wind-shield claims);

2. Mr. Butler and Mr. Dougherty are clearly overworked and, as a result, are incapable of handling their files in the proper manner;

3. Reservation of Rights letters are issued months after suit is filed in most cases, which could expose the program to financial harm if they are deemed untimely;

4. Excess letters to CRL, our re-insurer, are routinely late which could expose the program to financial harm if they are deemed untimely;

5. A pervasive "hardball" or "defend all claims and lawsuits to the death" philosophy exists in the operation of ACCO-SIG which leads to considerable waste and unnecessary litigation expenses;

6. The philosophy above means that most claims (other than first-party or obvious claims) are denied outright and forced into litigation which causes increased litigation expenses;

7. Incomplete releases are used in settlement of claims which could expose the program to additional claims and unnecessary financial harm;

8. There are no anticipated legal budgets from defense counsel in any of our files/lawsuits that we can hold legal counsel to;

9. Litigation guidelines are not used – these are used by <u>all</u> insurers and self-insured risk pools to hold all defense counsel accountable for their actions and/or litigation expenses (the litigation guidelines that do exist are not being implemented or used);

10. There are no real checks and balances, oversight or thorough audits on the payment of attorneys' fees (Mr. Butler is overworked, and after personally reviewing hundreds of attorney bills, I do not believe attorney bills are being

5

Exhibit 2

audited properly. In short, I think attorney bills are "rubber stamped" because Mr. Butler does not have the time it takes to audit bills properly. Mr. Butler has told me he has cut attorney time on bills. However, I found numerous examples of attorney time that was ultimately paid that should have been cut. For example, according to the current ACCO-SIG litigation guidelines (which are not being used), ACCO-SIG will not pay law firms to get a new attorney "up to speed" on a file when the firm experiences internal turnover; yet, I found an example of ACCO-SIG paying for this very thing within the first few files I reviewed);

11. Mr. Butler and Mr. Dougherty only have to seek Board approval for settlements over $50,000.00. In other words, they can each spend in excess of $500,000+ in litigation fees on any lawsuit without ever discussing the expenditures with the Board (or really anyone else). Again, these expenditures (of taxpayer monies) are unchecked;

12. The Executive Director requires ACCO-SIG to use one defense firm on all of our lawsuits, unless there is a conflict of interest. Interestingly enough, she requires the ACCO-SIF staff to use a panel of 7-10 law firms and requires the claim handlers to send cases to each firm. However, ACCO-SIG must use the Collins, Zorn, Wagoner firm on the second floor;

13. The hourly rates of our defense firms are raised without Board approval (I believe this recently occurred with the Pierce, Couch firm);

14. Requests for informal settlement negotiations in the early stages of litigation are systematically denied by Mr. Butler (this is part and parcel of the "hardball" philosophy at ACCO-SIG);

15. Deductible fund accounts are never up to date;

16. Conflicts of Interest in cases are not minimized which causes litigation costs to double because we are forced to hire conflict counsel - *i.e.*, Pierce, Couch;

17. We provide defenses (attorneys) to defendants that should be excluded under the Coverage Agreement – *e.g.*, a deputy who admits to statutory rape;

18. We fail to request other insurance carriers to represent and defend our counties when the county is named as an additional insured on a contractor's insurance policy (we are beginning to do this now);

19. CRL constantly questions our handling of claims (in other words, most of these issues are clear to professionals in the industry);

20. The defense firm we are required to use has access to ACCO-SIG's offices 24 hours a day (a government entity); and

21. Most importantly, the Executive Director's massive Conflict of Interest with the Collins, Zorn, Wagoner firm - the same firm she requires ACCO-SIG to use on all litigation.

6

Exhibit 2

Most of the issues above lead to some kind of monetary waste. The "hardball" philosophy is an archaic philosophy that not only leads to waste, but is nonsensical. I have been told that the philosophy has been omnipresent since the beginning of the ACCO-SIG program in 1986. This philosophy only benefits the defense counsel hired to litigate our lawsuits. The philosophy does not decrease lawsuits or claims as some contend. That should be clear as ACCO-SIG's claims and lawsuits have never been higher.

In addition, the "hardball" philosophy leads to the gross waste of taxpayer dollars through unnecessary litigation. For example, I know of five wire-cutting claims currently in litigation. The actual property damage alleged in the five wire-cutting cases total approximately $12,000-$14,000. However, there was $6,443.00 in damages alleged in one case. Attorney fees are recoverable in property damage claims. That means, if we lose, Plaintiff's attorney can recover his/her fees. ACCO-SIG has approximately $205,000.00 reserved on these five files. In other words, ACCO-SIG is willing to spend $205,000.00 to litigate claims worth $12,000-$14,000. That absurdness speaks for itself.

Moreover, the property damage on average in these cases is $800-$1400. Importantly, the company/claimant (usually AT&T or Southwestern Bell) will almost always "split the baby" and accept half of the value of the property damage. So, we could likely settle those five claims for around $5,000-$7,000 instead of spending $100,000-$180,000+ in defense costs litigating the claims just to prove we are right. Because AT&T and Southwestern Bell have in-house counsel handling these claims, the claims will always be made. In short, ACCO-SIG gains nothing by defending them. In the end, the proper business decision should be made after performing a cost-benefit analysis to protect the program. Again, this is just a current example illustrating how the "hardball" philosophy leads to waste and really only benefits the defense counsel defending our counties.

I discovered the issues above through August, September and October, and I started searching for internal solutions. I immediately started drafting extensive litigation guidelines for our claims handlers to use to control defense costs and hold our defense counsel accountable. Litigation guidelines must be utilized and enforced. They give the program control over our defense counsel, the direction of litigation and defense costs. It is unacceptable that litigation guidelines are currently not being used and enforced. It is financially irresponsible.

I also implemented weekly docket meetings wherein Mr. Butler, Mr. Dougherty, Mr. Birdsong and I meet to discuss our current claims and lawsuits. The docket meetings are designed for group participation and discussion regarding claims and lawsuits. The docket meetings are designed to eliminate the lack of accountability and checks and balances within our claims handling operations. Obviously, for docket meetings to work effectively, it takes

7

Exhibit 2

participation and a willingness to consider alternative methods of handling files/lawsuits.

Mr. Dougherty has participated 100% and has started handling claims in a more economic and efficient manner. However, he is still overworked. Mr. Butler refuses to accept any course but his own. It is clear that Mr. Butler is unwilling to: (1) budge from the way he has always operated, and (2) consider more efficient or economic methods of handling claims/lawsuits. I think Mr. Butler can be a tremendous asset for the program because of his history and knowledge of civil rights law. But unless he changes, Mr. Butler will continue to be a liability to this program through the mishandling of claims and lawsuits which ultimately increase litigation expenses. No one, including me, should be left unchecked in the operation of ACCO-SIG. We all must be accountable to one another. We must work as a team at all times, understand we are not always right, consider other's points of view, and have the wisdom to accept and learn from constructive criticism.

By late September-early October, Mr. Butler had told me point blank that he was not going to listen to me, and he was not going to consider alternative philosophies or methods of handling claims unless he was advised to change by ACCO-SIG's Board. I advised the Executive Director of Mr. Butler's statement in this regard and all of the other issues outlined above in personal meetings and/or emails. By this time I had reached the end of my rope trying to handle the matters internally as advised by the Executive Director. In short, I could not let the Executive Director continue to muzzle me and hide glaring operational issues/problems from the Board.

After advising the Executive Director of all of the issues above, and Mr. Butler's unwillingness to participate, things began to change for me at ACCO-SIG. Looking back, I am confident now that the Executive Director understood what I had uncovered, and that I understood the full magnitude of the situation, which I did. If you recall, I started discussing the problems/issues identified above at our ACCO-SIG board meetings in September/October, maybe even August. I was outspoken about the issues, but I tried to be general and generic as possible because I did not want to hurt Mr. Butler's or anyone else's feelings. Moreover, the Executive Director had cautioned me about talking to the Board regarding the daily operations of ACCO-SIG and the issues/problems within that operation. So, I tried to explain to the Board generally that we had major operational issues and problems that I could not get control of because I was not provided the authority by the Executive Director to control them.

However, I believe as Board members you deserve to know the facts to make the proper decisions that are required of you. I was not going to let the Executive Director's thinly veiled threat - to keep quiet - deter me from telling you all the issues I discovered at ACCO-SIG. Change and progress are stymied when critical facts necessary to make decisions and change are intentionally withheld - *i.e.,* if you think everything is fine, like the Executive

8

Exhibit 2

Director wants, the problems will never be rectified and one day it will be too late for this program. You deserve to know the truth. And frankly, I was disgusted that I was told to keep quiet when I have a professional duty to tell you the facts.  Clearly, the Executive Director does not understand the ethical duties of an attorney - I have an ethical duty to tell each of you all the facts, regardless of whether she tells me otherwise.

I would like to present you with one comparison.  OMAG is identical to ACCO-SIG. OMAG has been in operation 8 years longer than ACCO-SIG (formed in 1978 I believe). To my knowledge, OMAG has never operated under a "hardball" or "defend at all cost" philosophy.  OMAG currently has <u>$66 million in surplus</u> (ACCO-SIG has $4 million in surplus).  OMAG has 21 attorneys/law firms on their panel of defense counsel.  OMAG's defense firms are spread out across Oklahoma.  In short, OMAG does not use one law firm in Oklahoma City to defend suits all over the state because it is uneconomical and inefficient.  The Executive Director and General Counsel of OMAG told me this directly in meetings with them. I will never forget Stephen Reel's (OMAG's General Counsel) statement in that regard: "<u>in this business principles cost money, and that is why I have none</u>."  In other words, an entity like ACCO-SIG cannot operate efficiently under a "hardball" principle because it costs a significant amount of taxpayer money.  In short, personal principles, beliefs or egos must be set aside to handle claims and lawsuits efficiently.  It is a business decision in the end.

So again, in September/October I began discussing the problems with the "hardball" philosophy, and I explained what litigation guidelines were, the fact that we were not using any, the fact that I was drafting a set, and the fact that we did not have litigation guidelines (I later discovered ACCO-SIG had litigation guidelines that were not being used in an old claims manual).  I also discussed the purpose and value of litigation guidelines.

In mid-October, I attended my best friend's wedding in California. During this trip, the Executive Director contacted me and advised that Carla Bonner, a recently terminated employee, had made accusations that I was "having an affair" with the Executive Director. This mentally and physically disturbed me and ruined my vacation. I have since learned the Executive Director's statements to me in this regard were false, and that Carla Bonner never made such statements.  I now see that the Executive Director told me that so I would discredit Ms. Bonner, and in essence, appear as an ally of the Executive Director.

In November, I discussed several legal tools ACCO-SIG could utilize to minimize our exposure to Plaintiff's attorneys' fees in cases - *e.g.*, the use of Offers of Judgment. I also discussed the fact that ACCO-SIG routinely defends defendants that are not owed a defense, thus costing the pool money.  I also discussed that most, if not all, of the jail sexual abuse lawsuits should be tried, and that the cases are being overvalued.

Exhibit 2

Interestingly enough, the Executive Director, Mr. Birdsong and I were at a 2 day Executive Director risk conference in Dallas in early October (I believe) where the Executive Director asked Mr. Collins to present a seminar regarding sexual abuse claims. After Mr. Collins made his presentation and discussed the $13.5 million dollar Delaware County settlement and the $10 million Custer County settlement, an attendee raised his hand and asked the following question: "where are you getting those numbers from?" In other words, why would anyone ever agree to a settlement of that magnitude in these types of cases? Later that night, Mr. Collins took me, Mr. Birdsong and the Executive Director to an expensive dinner at the Dragonfly restaurant in the Hotel ZaZa.

Now if you recall, and I know Chairman Brad Raven does, the Executive Director was not present during the first executive session at the November meeting because she arrived late to the office. After the first executive session, Chairman Raven specifically called the Executive Director into the following executive sessions. If you also recall, that is the meeting wherein I told the Board that I had no power to make the necessary changes in the handling of files and that the adjusters would not listen to me without Board approval. Chairman Raven told me that the Board hired me to do the job. Little did he know, the Executive Director had not provided me with any real operational authority, and as I previously stated, Mr. Butler was unwilling to listen to me or consider alternatives without Board action. So again, my efforts were thwarted and Chairman Raven clearly did not understand the message I was trying to give him – i.e, I needed help from the Board because I was getting none from the Executive Director or Mr. Butler.

Obviously, the Executive Director did not take kindly to me talking to Board Members or Commissioners about our internal problems/issues without her present and without her prior approval. She made that clear to me again after the November Board meeting. The week after the meeting, the Executive Director called me to her office and scolded me for "making her look bad," and "talking about things I shouldn't be talking about." She reiterated that the issues/problems I was discussing with the Board must be handled internally. Stated differently, she again told me to keep my mouth shut. Although I believe I had done nothing wrong and was simply trying to help ACCO-SIG by advising the Board of the issues, I apologized to the Executive Director for fear of termination. Of course, the problem with the Executive Director's order - to handle things internally - was that she would not address my issues/concerns internally. So, the status quo remained.

I had finalized and completed a set of restrictive litigation guidelines by the December Board meeting. I advised the Executive Director of my intention to put them on the December agenda and even provided them to her via email in advance for her review. Again, I emailed them to her because she is never in the office. Honestly, it is nearly impossible for employees to know what to do or how to act when the boss is never present yet wants to make all the decisions and run the place with an iron fist. That type of

10

Exhibit 2

employment atmosphere creates immense psychological, emotional and physical issues for ACCO employees as Carla Bonner discovered and as I was already discovering.  I have never endured the type of work related stress that I have had to endure because of the actions of your Executive Director.  Keep in mind – I have defended numerous high profile cases in litigation.  None of the stress related to my career in litigation has come close to the stress and anxiety I have endured the last five months. Mr. Birdsong and I describe the matter as "ACCO PTSD."

As I told the Executive Director and everyone else, I believe a governmental program like ACCO-SIG requires restrictive litigation guidelines because we are handling the expenditure of taxpayer monies on a daily bases. I got the courage to explain my concerns in this regard to Chairman Brad Raven about 30 minutes before the December Board meeting. Not only did I express my concerns about the lack of litigation guidelines to Chairman Raven, I also advised that I had significant concerns about Mr. Collins, and the issues that are created for the program by Collins' firm being a tenant on the second floor of ACCO-SIG's building. I asked Chairman Raven to keep my concerns confidential (for fear of retribution by the Executive Director) and asked that we discuss the issue at a later time and date. I assume that Chairman Raven took my concerns to the Executive Director after our brief conversation because I was in the "dog house" after the December Board meeting.  I am sure my concerns scared Chairman Raven, and frankly, as Chairman, he should have taken the issues to the Executive Director.  I am unsure what the Executive Director has said about me to Chairman Raven, but I can assure you that 100% of it is likely false or misleading and intended to manipulate Chairman Raven's opinions.

At the December Board meeting, I again reiterated the importance of the litigation guidelines, and the fact that they are necessary for ACCO-SIG to have operational control over its own program. Mr. Larry Derryberry stated openly in the December Board meeting that litigation guidelines could potentially save the program $1/3^{rd}$ of its annual litigation expenses.  As previously stated, ACCO-SIG spent roughly $3.7 million on litigation related expenses in 2013-2014. So, as an example, the implementation and use of litigation guidelines could potentially save the program over $1 million annually. Those are Mr. Derryberry's statements, not mine, but I believe his statements are accurate.  In short, there is absolutely no downside to the implementation and use of litigation guidelines.  As I previously said, it is financially irresponsible for ACCO-SIG to not utilize them.

I was already receiving the silent treatment from the Executive Director prior to the December Board meeting. I specifically recall that my Thanksgiving was miserable and riddled with anxiety.  The Executive Director is the most paranoid person I have ever met and is constantly playing mind games, *e.g*., the silent treatment.  If the Executive Director sees an ACCO employee talk to a Commissioner, she immediately assumes the worse and begins monitoring the employee's emails and computer activity.  I know for a fact that has

11

Exhibit 2

happened to me. Mr. Birdsong and Carla Bonner both expressed their concerns to me regarding the same thing happening to them. Again, those types of actions are unprofessional, create anxiety and paranoia around the office, and make the place unbearable.

In mid-December, the silent treatment intensified. I made multiple requests (via email because she was never at work) to meet with the Executive Director to discuss all of the issues I had uncovered and to discuss, once again, her conflict of interest with Mr. Collins. The Executive Director ignored my requests and did not speak to me again until Tuesday, January 6, 2014. Needless to say, my holidays were a living hell. My wife cried for hours because I was non-existent – I could not stop fixating on my work related issues and the circumstances the Executive Director had created. I could not comprehend how I was getting "blackballed" and in trouble for trying to implement sensible, cost efficient policies and procedures and claim handling strategies to help ACCO-SIG save taxpayer money and better utilize taxpayer money. The fact that I was simply trying to give the program what it needed – some accountability, better claims handling, litigation guidelines to take control of the risk pool, etc. – and was somehow in trouble with the boss baffled me to say the least.

That leads me to the Executive Director's MASSIVE conflict of interest with Mr. Collins. I immediately saw the conflict of interest the Executive Director has with Mr. Collins after being hired. I knew my actions in updating and reforming the program could have an adverse impact on the Executive Director's relationship with Mr. Collins. That is why I routinely asked the Executive Director (playfully) if Mr. Collins "was mad at me yet." The Executive Director always said "no" and "why?" I constantly told her that the changes that must be made to the program to ensure its financial stability would necessarily lead to less revenue for Collins' firm. I explained that and the conflict of interest to her on multiple occasions.

I also explained to her the need to use additional attorneys instead of just Collins' firm, especially for tort related matters in remote counties. In makes no economical sense, and is a gross waste of taxpayer funds, to pay an Oklahoma City attorney mileage and attorney fees to drive to McCurtain County (or any other county outside 40-75 miles) to handle tort litigation. It is clear waste, plus the program would be better off hiring local counsel who has a relationship with the local judge, or in the alternative, hiring in-house counsel at ACCO-SIG to handle all tort related matters across the state. That way, ACCO-SIG can try the cases it wants to try without paying attorneys exorbitant hourly rates (plus mileage and expenses) to do so. The current method of hiring Collins' firm on all matters is a gross waste of taxpayer money. With the current method, the program has no ability to compare attorney work-product or even request rates from other firms who may accept ACCO-SIG's defense business for comparable or more favorable rates. It simply makes little sense as a government entity to put all of our eggs in one vendor's basket.

12

Exhibit 2

Over the course of my time at ACCO, I have discovered a lot of unsettling information regarding the relationship between Mr. Collins and the Executive Director. Remember, before I stepped foot in that building, there was no real day-to-day professional oversight of that program. I do not say that as a knock to my co-employees. I love my co-employees and get along with them great on a personal level. However, the only professional in the building was Mr. Collins, ACCO-SIG's vendor, on the second floor. I apologize if that sounds harsh, but it is the truth. And it had been like that for years.

Several issues regarding the relationship between the Executive Director and Mr. Collins caused red flags for me. For example:

(1) Mr. Collins' firm currently employees the Executive Director's brother, Dennis Winsett, to provide maintenance/janitorial services for ACCO-SIG's building. ACCO-SIG pays Mr. Collins' firm a monthly janitorial fee of $2,700.00.

(2) ACCO-SIG also pays a lady named Sherie Howland a fee of $950 monthly to perform janitorial functions;

(3) The Executive Director and Mr. Collins are "best friends" and communicate all the time – the circumstantial evidence indicates that they likely discuss operational matters of ACCO-SIG. In fact, I have been told that the Executive Director does not make a decision regarding ACCO-SIG until running it by Mr. Collins, the vendor.

(4) The Executive Director and Gayla Morgan-Jones, one of Mr. Collins' Partners, are close friends and talk all of the time – the circumstantial evidence indicates that they likely discuss operational matters of ACCO-SIG. Ms. Morgan-Jones is always at CED meetings and District meetings even though it is unclear why;

(5) I have been told that ACCO employees can only accept gifts from one vendor – Mr. Collins. ACCO's staff Christmas party included Mr. Collins' firm. At the party, Mr. Collins had Felicity hand out $50 visa cards to ACCO employees. Mr. Collins also put $100 bills in gifts during a game of dirty santa ;

(6) Mr. Collins has 24 hour access to our offices at ACCO-SIG. He has access to all of our confidential and proprietary information at all times (Do any of your vendors have that type of access to your buildings?);

(7) Mr. Collins does favors for the Executive Director all of the time, whether it is through building renovations (e.g., the chandeliers in the ballroom), legal work, hiring relatives, gifts, expensive dinners, etc. The Executive Director made this clear at ACCO-SIG's February Board meeting;

(8) The Executive Director used Mr. Collins' "favors" as justification for not raising Mr. Collins' rent at a governmental building – which has not been

13

Exhibit 2

raised since 2008 and should have according to the Consumer Price Index. She openly fought at the February Board meeting for Mr. Collins' rent to remain unchanged, which is strange under the circumstances to say the least;

(9)     After the February SIG/SIF Board meeting wherein Mr. Collins' rental agreement was discussed, Austin, our new CPA, advised me that he was reprimanded by the Executive Director for advising the Board of the Consumer Price Index terms of the rental agreement.  Further, I wanted to advise the Board at the meeting, but couldn't for fear of termination, that almost all of Mr. Collins' renovations are considered "temporary fixtures" pursuant to the rental agreement – meaning he can remove the items when his lease expires or he desires to move locations.  I could not make that point for fear of retribution by the Executive Director. Austin has already indicated to me that he cannot work in an environment where he is reprimanded for providing the Board with all of the necessary facts they need to make an informed decision.  In short, he cannot work in an environment where he will be muzzled just so the Executive Director can push through her agenda. Moreover, it was quite clear to me that the Executive Director was texting Mr. Collins during the February Board Meeting when the Board was discussing Mr. Collins' rental agreement. This was clear to me and likely others considering Mr. Collins showed up during the meeting.  I am certain ACCO's telephone records would indicate one way or the other;

(10)    It is widely known that a few ACCO employees have received free legal advice from Mr. Collins;

(11)    The Executive Director continuously refers to Mr. Collins as a "great partner" when in fact his firm is a *vendor* of a governmental agency;

(12)    The Executive Director has advised me that Mr. Birdsong and I (ACCO employees) must go with Mr. Collins to our member counties and essentially sell the jail training program Mr. Collins has established through his side business - Civil Rights Training, LLC - with Ken McNair and his partnership with the Oklahoma Sheriff's Association.  Not only that, the Executive Director has advised that we must press our counties to find ways to pay Mr. Collins for the training and eventually make Mr. Collins' training a mandatory prerequisite of obtaining insurance through ACCO-SIG.  In the alternative, she wants to provide discounts to our member counties that take Mr. Collins' training course and receives accreditation.  In other words, if a county participates in a jail training seminar through Mr. Collins' Civil Rights training, LLC, and updates it policies and procedures, ACCO-SIG will provide the county with discounted premiums. The Executive Director wants to use salaried ACCO

14

Exhibit 2

employees to do this. The use of ACCO employees in this regard is wrong, although I agree our Sheriff's departments and jails across the state need help;

(13)   In my opinion, the above scenario is a clear conflict of interest for Mr. Collins if he intends to defend the same counties in civil rights' litigation (*e.g.*, how can you train the county and then represent the same counties in civil rights' cases without running amuck of the conflict?);

(14)   I have been advised that the Collins firm was "shaken" when the Executive Director hired me because it was one of the few times she did not consult with Mr. Collins before acting;

(15)   After being hired, the Executive Director pressed me to befriend and hang out with Mr. Collins;

(16)   Mr. Collins' side business, Civil Rights Training, LLC, uses ACCO-SIG's Ballroom for conferences.  It is unclear to me whether his side business pays ACCO-SIG a rental fee for its use of the ballroom like any other renter.

(17)   I was questioned at length in my office by Mr. Collins' Partner, Gayla Morgan-Jones, in mid-December following our New Officer training classes at ACCO.  Ms. Morgan-Jones questioned me regarding "my job responsibilities at ACCO."  Please take the time to let that soak in - I was thoroughly confronted and questioned by a *vendor* about what my job responsibilities were at the program. Although I felt the confrontation regarding my job responsibilities was unusual, unnecessary and odd to say the least (considering it was from a *vendor*), I advised her that I was hired to provide operational oversight of the insurance programs and my goal was to cut cost, waste, and make the programs as efficient, economic and cost effective as possible. I also explained to her that my work would likely cause her firm's revenue to decrease, and that it was not a personal issue, but rather, it was business.  (It is my opinion that this did not sit well with Ms. Morgan-Jones, and that she likely discussed the confrontation with the Executive Director over the holidays - likely at Mr. Collins' Christmas Party that the Executive Director attended); and most importantly,

(18)   The Executive Director requires ACCO-SIG to give all of its legal business to Mr. Collins' firm.

These examples of the Executive Director's massive conflict of interest with Mr. Collins made red flags shoot through my brain. I am unsure how or why their relationship has never been questioned, or how the Executive Director fails to understand the conflict of interest. Mr. Collins is a *vendor* of a governmental entity, just like any vendor of your county government. Mr. Collins' understands that he is paid with taxpayer monies, and that an

15

Exhibit 2

attorney in his shoes has a heightened duty when being a vendor of a governmental entity.

After being confronted by Mr. Collins' Partner, Gayla Morgan-Jones, in mid-December, I felt something was really wrong.  I had questions and significant concerns about the Executive Director's relationship with Mr. Collins and Ms. Morgan-Jones before that confrontation, and I expressed those concerns to the Executive Director.  But nothing could prepare me for what happened next.

It is clear to me now that Ms. Morgan-Jones advised the Executive Director of her confronting me in my office.  For all I know, the Executive Director may have set the whole thing up.  It is also clear to me now that the Executive Director shared my proposed litigation guidelines with Mr. Collins. This is all clear because the Executive Director would not even respond to my emails (requesting a meeting with her) after my conversation with Ms. Morgan-Jones.  Instead, the Executive Director ignored all my attempts to communicate up until our meeting on Tuesday, January 6, 2015.  Like Thanksgiving, my Christmas was a living hell thanks to the Executive Director's silent treatment.  I could feel the pressure mounting, and I felt like the Executive Director was trying to force me to quit.

Bear in mind, the only thing I had done between March 2014 to January 6, 2015, was draft litigation guidelines, begin drafting a new claims manual which would outline our internal policies and structure, review claim files, review Mr. Collins' and Mr. Lafferandre's billing statements, revise and update antiquated agreements, contracts, bylaws, articles of association, tried to get the facts to the Board even though I was told to keep you all in the dark, implemented weekly docket meetings, began drafting the program's reservation of rights letters, and advised the Executive Director of her conflict of interest with Mr. Collins' and the appearance of impropriety that was created by the relationship. I also managed the Safety Program/Team at the Executive Director's request.  In other words, I had done nothing but try to implement and establish policies, procedures and guidelines to make this program more efficient and economical.

On January 6, 2015, after all of the above, the Executive Director called me into her office and immediately began yelling that "this is not working out," I had "just caused [her] problems," and that it was similar to the "Carla situation."  She threatened to terminate me several times throughout this confrontation. I was thoroughly confused by the entire situation and sat in her office stunned.  She asked me why I was "looking at legal bills," why I had "resentment" for Mr. Collins, and essentially, why I was trying to change her situation in that regard by using additional vendors.  I advised her that I had absolutely no resentment for Mr. Collins, that I actually thought he was a funny guy, and that my actions were exclusively designed to not only protect the program, but to insulate her from her own conflict of interest with Mr. Collins.  She responded that she knew what was best for the programs, and that Mr. Collins was the person for the job.

16

Exhibit 2

First, the Executive Director is not a legal expert or an insurance expert. She has no idea how these programs operate. She makes sure that the litigation business is sent to Mr. Collins' firm. Other than that, she comprehends very little. I know because I have had several conversations with her about the business, and she does not understand it. Second, civil rights' defense is not patent law. There is nothing highly technical or specialized about it. There are several civil rights' defense firms around this state. Further, there are tons of defense firms across this state highly capable of handling torts and employee disputes. Again, it is a waste of taxpayer funds to pay an Oklahoma City law firm to handle torts or other issues in remote counties of this state.

In short, the Executive Director did not understand what I was saying about the use of other law firms or anything else. What I was telling her was, her conflict of interest with Mr. Collins would dissipate by implementing policies and procedures, litigation guidelines, etc., for ACCO-SIG. The policies and procedures, etc., would at least provide her with some layer of insulation from the appearance of impropriety. Again, she did not understand what I was saying. She did not understand that I had been doing the very thing she hired me to do. That was clearly over her head, and it again caused me to question the entire operation of ACCO-SIG and her relationship with Mr. Collins.

I knew at this point that there was no hope. The Executive Director continued to chastise and reprimand me in the January 6 meeting for my actions (*i.e.*, trying to help the program). She told me she would not let me "destroy everything she has worked her ass off for." She told me she was "best friends" with Mr. Collins, which caused me additional concern. Finally, the Executive Director told me that my job responsibilities would be changing. She advised that I would no longer be involved with claims. She advised that my proposed litigation guidelines were not to be placed on the January agenda, and that the guidelines should be rewritten and only "about 2 pages since we don't deal with many attorneys." She told me the doors to the ACCO-SIG offices where Mr. Collins has 24-hour access would not change because "that's the way it's always been." For the record, I have heard - "that's the way I've always done it" or "that's the way it's always been" – countless times when questioning my co-employees about ACCO-SIG's claims handling and litigation "hardball" philosophy and strategy. The kicker, if I was not terminated, my involvement with the insurance operations would be minimal; instead, I would now be working primarily on ACCO legislative matters and creating relationships with Sheriffs – the same generic task the Executive Director gave Ms. Bonner before her termination.

I was in shock and really did not know what to do or think during this meeting. However, it was quite clear to me that I needed to fall on my sword, beg for forgiveness, and retain my job (if I could) because I have a family of 5 to support. At the same time, I knew I needed to begin getting the facts to the Commissioners despite the fact that the Executive Director assured me I would be fired if I was not "on her team" and did not "play by her rules." At

Exhibit 2

6:11-cv-00376-JHP Document 297-2 Filed in ED/OK on 10/14/15 Page 18 of 24

this point, it was not difficult for me to see that the only thing that could have possibly set the Executive Director off were my attempts to explain the program's issues to the Board, my attempts to make ACCO-SIG more efficient and economical, and my attempts to implement litigation guidelines to give ACCO-SIG control over the program and hold her best friend, Mr. Collins accountable.

The fact is, there was no professional other than Mr. Collins in that building since the Executive Director took office in 2007. Mr. Collins and the Executive are best friends. Mr. Collins' litigation expenses went up substantially after the Executive Director took office - from roughly $1.5 million to well over $2 million annually since. Those are the facts. The Executive Director likely consulted with Mr. Collins regarding the operation of ACCO-SIG during these years as they were friends. I have been told as much. The problem with that is, Mr. Collins' firm is the governmental entity's primary vendor due to the Executive Director's orders. Mr. Collins should have no influence over the operation of ACCO-SIG, the governmental entity that pays his firm.

I played along with the Executive Director after the January meeting and acted like everything was fine. I told her what she wanted to hear and agreed with everything she said. She sent out emails confirming that she wanted the litigation guidelines rewritten, that I was going to be involved with Sheriffs and ACCO legislation, and that she wanted me riding with Mr. Collins to Sheriff's offices when a county purchased his jail training package..

At the end of January, the issues surrounding ACCO-SIG and the Executive Director's motivation for threatening me with termination became crystal clear. On this day, Mr. Collins came to my office because the Executive Director wanted us (me, Mr. Birdsong, Mr. Collins and the Executive Director) to meet to discuss finding a way to make Mr. Collins' jail training through his Civil Rights Training, LLC, mandatory or a prerequisite for ACCO-SIG's program. At the very least, the Executive Director wanted me and Mr. Birdsong to go with Mr. Collins or get him in the door at the Sheriff's offices of our member counties so he could sell his program.

Prior to this meeting, Mr. Collins grabbed Mr. Birdsong and came into my office and shut the door. Mr. Collins wanted to tell us something. What Mr. Collins said next confirmed some of my suspicions regarding the level of his involvement with and influence over the operation of ACCO-SIG through his relationship with the Executive Director. Mr. Collin's proceeded to explain to Mr. Birdsong and me that David Lee, the only attorney that had ACCO-SIG business (Cleveland, McClain and Garvin counties) other than Mr. Collins, had approached Mr. Collins and asked whether he would be interested in dissolving his firm into Mr. Collins' firm. Mr. Collins told us that he agreed to take Mr. Lee in and then made the statement "now I have the entire state."

18

Exhibit 2

To me, that statement was a direct admission that the individuals who are employed to operate ACCO-SIG and have operational understanding of the program (me, Mr. Birdsong, Mr. Butler, and Mr. Dougherty) – a governmental entity – had no authority or control over the choice of defense firms we used to defend our counties.  In other words, Mr. Collins made it clear to me that he controlled, through his relationship with the Executive Director, the assignment of ACCO-SIG's defense files to his firm.

Mr. Birdsong and I routinely discussed the possibility that we did not have real control over the ACCO-SIG program, and that the Executive Director had ceded control of the governmental entity to its vendor, Mr. Collins, though their personal relationship. The fact is, Mr. Birdsong understood the problems associated with the Executive Director's relationship, but was scared to do anything because she was the boss, and he knew he would be fired if he brought the matter to light.  It was a nightmare scenario for me because, as an attorney, I have a duty under the law to bring this matter to light.  I could lose my legal license if I fail to bring the matter to light.  I did not ask for this, but I truly believe the Lord does not give us more than we can handle.

After the conversation with Mr. Collins at the end of January, I felt it was necessary to begin contacting Commissioners I believed I could trust to explain the situation. These were not issues I could discuss openly at a Board Meeting as I would be terminated. At this time, the Executive Director had started being overly nice to me, which was a complete 360 degree change from the way she had treated me the previous 5 months.

I started discussing the problems with Commissioner Rod Cleveland in off hours. Commissioner Cleveland and I live in the same county, and it was easy for both of us to meet.  Commissioner Cleveland had always had questions and concerns, but the Executive Director never allowed ACCO-SIG's employees to give him enough information to connect the dots.  Once I started explaining to him how the day-to-day operations were handled, the dots were connected. I also discussed the matter with other Commissioners.

Commissioner Cleveland immediately saw the problems and started asking questions such as why the litigation guidelines were left off the January agenda, etc.  Commissioner Cleveland's concerns got back to the Executive Director.  The Executive Director immediately went into "clean up" mode. She immediately told Mr. Birdsong that the original litigation guidelines I drafted (which were on the December agenda and left off the January agenda by the Executive Director) should be placed back on the Board's next agenda for approval.

Thereafter, the Executive Director brought me into her office for another one-on-one meeting to test whether I was talking to Commissioners and to clarify other outstanding issues.  I knew from previous discussions with the Executive Director, that she did not want

19

Exhibit 2

Mr. Jerry Pignato, ACCO-SIG's legal counsel in the Delaware lawsuit, handling the matter for personal reasons. I explained to her again, like numerous occasions before, that it would be a waste of taxpayer money to hire new counsel and pay them to get up to speed on the complex file. However, in this one-on-one meeting, the Executive Director flipped another 360 degrees and advised that Mr. Pignato could continue representing ACCO-SIG in the Delaware matter if that is what I thought was best. I told the Executive Director that I was confused by her recent flip-flopping on issues, and the fact that the last time I really talked with her she had threatened me with termination. She told me that she threatened to fire me because "several Commissioners" wanted me gone. Of course, she never told me which Commissioners wanted me fired. I have never had one problem with any of you.

The final straw for me occurred this week. I had been scheduled to attend the NACO conference in Washington, D.C. at the end of last week. Personally, that would have been a waste of time and taxpayer money. My services are needed much more at ACCO. Moreover, at the February Board meeting, the ACCO-SIG Board authorized me to begin the process of sending out the amended bylaws and articles of association to our member counties so our members could vote on the implementation of them prior to the ACCO Spring Conference scheduled for April 1, 2015.
I drafted two resolutions last Friday and sent the documents to the vendor to place on memory sticks to send out to each county. That process has been completed and the memory sticks arrived at ACCO Monday (2/23) morning. However, I received a call from Mr. Birdsong on Sunday morning advising that the Executive Director had informed him, Felix, and Barbara (not me) via email to stop the process of sending out the articles and bylaws to our counties. I was not included on the communication.

When I asked Mr. Birdsong Tuesday at ACCO why I was not on the email, and why the process had been halted, he provided several irrelevant responses. These bylaws and articles are good for the program. There is no valid reason why the process should not have continued. Mr. Birdsong continued to state that "things were cooking" and he "felt uneasy" about what was going on and the things he was hearing from the Executive Director. Mr. Birdsong was clearly suffering from ACCO PTSD and paranoia like other employees. I continued to push for an answer because it was clear the Executive Director was isolating me again. Eventually, Mr. Birdsong stated that the process had to stop because "no one would be at ACCO to answer questions from the Commissioners." He also advised that I should have a "back up plan" – *i.e.,* another job.

At that point and time, I knew a letter to you, my bosses, was my only option. Once again, the Executive Director's actions have forced my hand. I tried to advise enough Commissioners of the issues/problems so the matter could be handled from within and with minimal disruption. I understand we are in legislative session now and we need to remain focused at the Capitol. Unfortunately, this was not in my control. There is no time line when

Exhibit 2

it comes to me potentially losing my legal license for remaining quiet. I anticipate the Executive Director will tell some of you that the reason the bylaws and articles were put on hold was either because of the weather, or that I was out sick this week. The truth is, the Executive Director unilaterally stopped Board action with respect to the articles and bylaws on Sunday (2/22) while in Washington D.C. All I had to do Monday/Tuesday was draft a cover letter because the memory sticks with the pre-loaded bylaws and articles were already at the office. The documents could already be in your possession.

I wanted you all to know the facts before the Executive Director assassinated my character and reputation (if she hasn't already). More importantly, I have a legal duty to explain the facts to you, and advise you that I believe the Executive Director's actions with respect to controlling ACCO-SIG amount to a gross mismanagement/misuse of public funds (at the least), and her actions could amount to more serious claims. Moreover, I believe the finances of ACCO-SIG are in jeopardy. ACCO-SIG's surplus is down to $4 million+ from $11 million. If the program gets an unfavorable ruling in the Delaware lawsuit, the entire surplus could evaporate. That is why immediate changes in the operation of ACCO-SIG are necessary. I can honestly say that the docket meetings and other measures that I have implemented are starting to change the operations. However, these changes must be embraced by all employees handling ACCO-SIG matters to be fruitful. It will clearly take some time to begin seeing the benefits in the financials, but I know it can be done.

Honestly, I truly respected the Executive Director prior to joining ACCO. However, I now see her for what she is – a woman who lives for the power associated with being Executive Director of ACCO. The problem is, ACCO and ACCO-SIG/SIF are not the Executive Director's personal business that she can run as she sees fit; rather, they are governmental entities that should be transparent and efficient. The Executive Director exists because of ACCO, not the other way around.

## ACCO

I spoke at length with Kim Faught before she left ACCO. Kim expressed several concerns to me regarding the Executive Director's handling of ACCO's visa cards. For example, Felicity and the Executive Director handle all payments and coding related to visa purchases. This is problematic. The process eliminates any independent oversight and, frankly, it simply raises questions. Even more concerning to me is that Kim advised that a Commissioner reviewed two months worth of visa bills after Ms. Bonner was terminated. After the review, the Executive Director paid ACCO back for *accidental* personal purchases on ACCO's visa. Kim told me that (*i.e.*, the Executive Director reimbursing ACCO) was the first time that had ever happened in her 7 years of employment as ACCO's CPA. Those facts raised additional red flags for me.

Exhibit 2

Moreover, I witnessed the Executive Director take Carla Bonner, ACCO's human resource employee, to Long Beach for a PRIMA Conference she had no business attending on the taxpayer's dime while ACCO's safety coordinator, Dale Frech, stayed home. That is a waste of taxpayer funds. Ms. Bonner will tell you that herself. Ms. Bonner told me that the Executive Director flew her to Tennessee on a Saturday during a conference just to party with the Executive Director one night and then fly home the following day. That is a waste of taxpayer funds. Ms. Bonner will tell you that herself.

I cannot sit idly by anymore while the Executive Director blatantly lies to the Board. Recently, the Executive Director has made an item on her agenda clear - she wants to remove monthly financial reports from both Boards, which is a ludicrous idea. That type of action prevents transparency. The Executive Director has supported her idea in this regard by telling the Boards that preparing monthly financial reports are burdensome, in part, because the accountants spend so much time working on deductible fund accounts. That is a bold face lie. The accountants at ACCO have not worked on the deductible fund accounts since last renewal. In other words, the accountants have not worked on the deductible funds on a monthly basis for over 7 years (even though that should be a monthly function). That cannot be a valid reason for removing the financial reports of these programs from the monthly agendas. It is simply a lie the Executive Director has relied on to support her own agenda.

Finally, I have witnessed the Executive Director utilize extreme measures in an effort to shuffle seats at the Boards. In other words, the Executive Director will use any means to retain her power over the Boards and ACCO. As an example, the Executive Director has clearly pulled the wool over the eyes of Chairman Raven and Chairman Alford. I have the utmost respect for both of these Commissioners, and it would be interesting to hear the lies/stories the Executive Director has told them about me. I am sure she has already poisoned the well.

To that end, Chairman Alford and Chairman Raven, I have now armed you with the truth. As General Counsel for ACCO and ACCO-SIG/SIF, I have a duty to advise you that you have a duty to act, and that ignorance can no longer be an excuse for inaction. If the Executive Director's personal relationship with Mr. Collins over the years has developed in such a way that Mr. Collins, as the primary _**vendor**_ of a governmental entity per the Executive Director's order, now has significant influence, or worse, operational control over the governmental entity that pays his bills, then there could be serious ramifications if heads are buried in the sand.

22

Exhibit 2

## <u>SUMMARY</u>

In summary, the hostile work environment that has been consistently created by your Executive Director is unacceptable.  It is impossible to work in a constant state of anxiety, stress and paranoia that has been artificially created by the Executive Director.  Further, I believe the time has come to "blow the whistle" on the gross mismanagement of public funds at ACCO-SIG, and the improper influence Mr. Collins has over this governmental program through his relationship with the Executive Director.  For the various reasons discussed above, the Executive Director has a conflict of interest with Mr. Collins and her actions have caused the appearance of impropriety.  The Executive Director's mandate – that only Mr. Collins' firm can be used – causes considerable waste.  Essentially, the Executive Director has monopolized the ACCO-SIG business for Mr. Collins, her "best friend."  That is not the proper way to operate a governmental entity.  Her continued emphasis on a "hardball" or "defend at all cost" philosophy that was created by defense firms handling ACCO-SIG's business leads to gross waste.  Clearly, all of these issues could amount to much more than gross waste.  The Executive Director's decision to use taxpayer monies to take "friends" on business trips amounts to gross waste.

I support you all 100% and want nothing but the best for you, Oklahoma counties, ACCO and ACCO-SIG/SIF.  I can honestly say that the facts have been kept from you as a result of your Executive Director's agenda.  However, you deserve to know the truth, and I have an ethical duty to inform you of the facts.  I have a problem when healthy Board discussion is thwarted because the Executive Director threatens to terminate employees if they provide you with the facts.  <u>That is the classic example of a bully</u>.  As I have previously stated, I have tried my best to serve you in the most honest, ethical, responsible and professional way possible. I have honestly never had a problem with any of you.  However, I have a family that I must support.  I left a prominent law firm to come work here, and I was on the partnership track at the time.  In fact, I was told that I would be made partner in 2014.  I left all that and accepted my current position because I love your insurance programs.  I have now lost that opportunity at my old law firm.

I will not compromise my legal license for the incompetent, unethical and potentially illegal behavior of a few.  I cannot stand around and watch ACCO-SIG go down in flames. To be clear, I would love nothing more than to continue my employment with ACCO.  I love ACCO and your insurance programs and want nothing but the best for them and you and your counties.  The insurance programs are one of the counties' greatest assets – Rogers County's current situation with Travelers is a testament to that (if you would like the details, please feel free to contact me).  I would love to be a part of transforming the programs into the first-class programs I know they can be.  This program should be a lasting legacy for your counties.

Exhibit 2

I want to reiterate that there are tremendous people working at ACCO. I have nothing but the utmost respect for the majority of my co-employees. Again, I apologize for the length of this letter. Thank you for your time.

Best regards,


Clay Bruner
General Counsel,
ACCO/ACCO-SIG/ACCO-SIF

24

Exhibit 2